NEGAUNEE IRON CO. *v.* IRON CLIFFS CO.[1]

1. EQUITY JURISDICTION—TRESPASS—INJUNCTION.

A bill may be maintained by a party in possession of land to restrain one who threatens numerous acts of trespass which will work irreparable injury to the complainant.

2. SAME—FORFEITURES—LEASES.

Where a lessee has abandoned the premises, and they have been held adversely by the lessor for many years thereafter, equity will recognize the forfeiture, and prevent the lessee from afterwards taking possession under the lease.

3. SAME—PARTIES—DEAD CORPORATIONS.

A corporation whose charter has expired by limitation is not a necessary party to a bill seeking to restrain defendants from taking possession of lands under an old lease to the corporation.

4. SAME.

Equity will enjoin the threatened acts of those assuming to act in the name of a dead corporation.

5. EQUITY PRACTICE—DEMURRER—JURISDICTION.

An objection that equity has no jurisdiction, because it appears from the bill that its main purpose is to enforce a forfeiture against one not made a party, should be raised by demurrer.

6. DEEDS—RULES OF CONSTRUCTION—INTENT OF PARTIES.

The rule that deeds must be construed most strongly against the grantor will not overcome the plain intent of the grantor, which fairly appears from the instrument as a whole.

7. SAME.

A deed will be construed so as to give effect to the intent of the parties, notwithstanding the technical definition of the words.

8. SAME.

Where there is a doubt as to the meaning of an instrument, the courts will consider the situation of the parties, the subject-matter, and the acts, conduct, and dealings of the parties with respect to the instrument.

---

[1] A writ of error to the Supreme Court of the United States was allowed in this case on December 3, 1903.

9. Same—Exceptions.

If a grantor retains title in himself to a part of the land described in the deed, it is an exception, and no words of inheritance are necessary.

10. Same—Reservations.

Where, by the language of a deed, rent or other incorporeal hereditament comes back to the grantor from the grantee, it is a reservation, and words of inheritance are essential to constitute a title to the thing reserved beyond the life of the grantor.

11. Same—Exception of Minerals.

A deed and contract attached thereto, executed at the same time as one instrument, contained a provision "reserving" to the grantor an undivided half interest in all minerals, and referred to the grantor's interest in the minerals as "his joint half interest therein." In various litigation and transactions concerning the lands, the title of the grantor to an undivided half of the minerals was recognized by the parties. *Held*, that the grantor retained title to a one-half interest in the minerals, which would pass to his heirs without words of inheritance.

12. Same—Right to Mine—Incorporeal Hereditaments.

Where a deed to certain mineral lands, in which the grantor retained title to an undivided half interest in the minerals, permitted the grantee and his assigns to mine the lands for their own use, but not to sell to other parties without accounting to the grantor for his half interest therein, the grantee obtained no title to the grantor's interest in the ore in place, but only the right to mine for the purpose specified, which was an incorporeal and indivisible hereditament.

13. Lease—Construction—Mining Rights.

A mining lease containing a provision that the lessee should remove no ore except such as it should actually convert into merchantable iron in its own furnaces or forges was *held* to give a right to remove ore only for the furnace then existing, where it appeared that the charter of the lessee provided for only one furnace, that the corporation at that time only intended to build one furnace, and that the only consideration for the lease was the discovery and development of iron ore on the premises.

14. Same—Abandonment.

Where the right under a lease to mine ores is appurtenant to a certain furnace, the voluntary abandonment and destruction of the furnace by the lessee destroys the right to mine ores under the lease.

15. SAME—ESTOPPEL.

> A corporation, after receiving a 99-year nonassignable lease,
> with the right to mine ore appurtenant to its furnace then
> existing, entered upon the lands, but, not finding ore in pay-
> ing quantities, abandoned the explorations, and for 43 years
> made no attempt to mine the lands. Another corporation be-
> came the owner of all its stock, and carried on all its furnace
> business. After the abandonment of the premises, grantees of
> the lessor, in good faith, entered upon the lands, and spent
> large sums in discovering and developing valuable mineral
> deposits, and continued their development for nearly 30
> years, without objection. *Held*, that the lessee was estopped
> from asserting its personal and incorporeal right to mine the
> lands.

Appeal from Marquette; Stone, J. Submitted Feb-
ruary 19, 1903. (Docket No. 48.) Decided September
15, 1903.

Bill by the Negaunee Iron Company, Edward N.
Breitung, and Mary Kaufman against the Iron Cliffs
Company, the Cleveland-Cliffs Iron Company, William
G. Mather, and Murray M. Duncan, to quiet title. From
a decree for complainants, defendants appeal. Affirmed.

In 1857, one James L. Reynolds was the owner in fee
of the lands involved in this suit, and other lands. Feb-
ruary 26, 1857, he conveyed to one Charles T. Harvey
4,162 acres by warranty deed. The deed, after the
description, contains the following:

"Which lands are sold with full warranty, subject,
however, to the conditions and agreements of the contract
marked 'A' herewith appended, between the parties
hereto, concerning the undiscovered minerals on said
lands."

Then follow the usual covenants of warranty of title.

The contract is as follows:

"This memorandum of agreement, made this 26th day
of February, by and between James L. Reynolds, of
Chicago, State of Illinois, of the first part, and Charles T.
Harvey, of Marquette County, State of Michigan, of the
second part,

" *Witnesseth*, that the party of the first part has this day conveyed by 'warrantee' deed (to which this contract is attached) to the party of the second part certain lands therein described, amounting to four thousand one hundred and sixty-two 46-100 acres, for the consideration of the sum therein named, and also in the further consideration of reserving to himself an undivided half interest in and to all the minerals which have been or may be discovered on the premises referred to as conveyed, together with the right of having or acquiring so much of the surface privileges as may be necessary to mine or develop the same by paying one-half of the equitable or appraised valuation per acre for the surface thus used or acquired : *Provided* not more than twelve dollars per acre shall be adjudged to be the value of unimproved lands taken for such mining purposes, besides which, however, full compensation shall be paid to the party of the second part, or his assigns, for damages which may by such mining or occupancy ensue to the business connected with or improvements placed upon such land by the party of the second part or his assigns. Such payment to be made by the party of the first part on an equitable, agreed value, or upon an appraised valuation made by disinterested 'referees,' one designated by each party (hereto), and they choosing a third, and the decision of the three thus chosen to be final. And, when such payment is made, he of the first part shall be entitled to enter upon and occupy any portion of said lands for mining purposes as aforesaid solely :

" *Provided*, and it is agreed, however, that the party of the second part, or his assigns, shall have the sole right, free of cost or compensation to the party of the first part, to mine for their own use, or for manufacturing purposes within the present limits of Marquette county, any mineral ores or marble found on any of the premises herein 'referred' to, but shall have no right to sell to other parties for exportation as aforesaid, without accounting to the party of the first part for his joint half interest therein."

On April 2, 1857, the Pioneer Iron Company was organized by Harvey and others, with a capital of $125,000, divided into 5,000 shares of $25 each. The purpose of its organization is stated in its articles to be "procuring a suitable location for a manufactory, and lands to furnish coaling facilities therefor, in the Upper Peninsula of the

State of Michigan, and working the same for the production of merchantable iron, and such other use of their lands as the company may hereafter determine and adopt."

On April 22, 1857, Harvey conveyed to the Pioneer Iron Company 2,688 acres of the lands conveyed to him by Reynolds, and 800 acres of other lands owned by him. The consideration expressed therein was $25,000. After the description is the following:

"All of which is sold subject to the reservation of minerals and conditions of using and developing and sale of the same on said lands as specified in the deed of the premises by James L. Reynolds and wife to the party of the first part; but all the interest thereby acquired by the party of the first part to the one undivided half of the minerals exported, and the privileges of manufacturing free of cost ores which may be mined on the said lands, is hereby assigned as fully as can be done by the party of the first part to the party of the second part hereto."

September 17, 1857, said Harvey executed an instrument (known as the "99-Year Lease") to said Pioneer Iron Company, conveying to it "certain rights and easements hereinafter described (subject to the provisions and limitations thereto annexed) in and upon certain pieces or parcels of land." After the description, containing 646 acres, this instrument proceeds:

" The rights and easements aforesaid being:
" 1st.—The right to cut and remove all the timber and wood standing or otherwise being on said lands, for the purpose of converting the same into charcoal, or such other uses as may be desirable in the prosecution of business by the party of the second part. Such wood and timber to be removed from said lands within five years from the date hereof, at such times within that period as the party of the second part may elect, in the following order, however, viz.: After clearing its own land on section six, T. 47 N., R. 26 W., the party of the second part shall next remove the timber and wood from the land in that section herein described until it is all removed. Then it shall remove that on land in section seven herein described. Then that on section eight in like manner. Then that on section five,

first clearing that on its own land in the same; and lastly that on section thirty-one, T. 48 N., R. 26 W.   (This last stipulation, however, to be subject to future agreements between the parties hereto.)

"2nd.—The party of the first part does hereby let, lease, and demise to the party of the second part, for the consideration hereinbefore mentioned, and for the full end and term of ninety-nine years from and after the date hereof, all the lands hereinbefore mentioned, and all other lands now owned by the party of the first part in either of the townships above mentioned, for the sole purpose of mining and quarrying, at its own expense, such ores and marble as may be found thereon, and subject to the provisions hereinafter mentioned, viz. :

"*Provided*, it shall not quarry, mine, or remove any ores on said lands except such as it shall actually convert into merchantable iron in its own furnaces or forges; and provided further, it shall not, in such mining or quarrying operations, use or injure any of the improvements which may be placed upon said lands by other persons without paying just and equitable damages therefor, nor shall it occupy in such operations more land than is absolutely necessary to open and work successfully such mines of iron or marble as may be discovered.   And it shall purchase and pay at the rate of twelve dollars per acre for unimproved lands which it may require for such purposes. The rights and easements above mentioned shall descend to the corporate successors of the party of the second part, but not to its assigns.   The party of the first part hereby agrees and binds himself in nowise to convey or incumber any of the lands hereinbefore mentioned, except with a reservation of all rights and easements hereby secured and intended to be secured to the party of the second part.   All the above rights and easements are subject, however, to the terms of a certain deed, and an agreement accompanying the same, executed by James L. Reynolds and wife to the party of the first part on the 26th day of February, A. D. 1857, and recorded in register's office of said county in Liber B of deeds, on pages 381 and 382, to which record for further particulars reference is hereby made."

This lease covers the land here in dispute.

On the same day the deed from Harvey to the Pioneer Iron Company was executed, viz., April 22, 1857, Harvey executed an instrument to the Pioneer Iron Company cov-

ering the same land as that described in the above instrument of September 17th.  The rights and privileges thereby conveyed are as follows:

"*First.*—The right to cut and remove all the timber and wood standing or otherwise thereon, for the purpose of converting the same into charcoal for manufacturing purposes, or such other uses as may be desirable to the party of the second part.  Such wood and timber to be used and removed within five years from date, when within that period it shall suit the convenience of the party of the second part thus to do: *Provided,* however, that after clearing its own land in fee on section six, T. 47, R. 26, it shall next remove the timber from the balance of land in that section herein described until it is all removed.  Then it shall remove that on section seven herein mentioned.  Then that on section eight in like manner.  Then next in succession that on section five, after clearing its own land on the same; and lastly those in section thirty-one, in township 48 of range 26 west.  This stipulation, however, at all times to be subject to future agreements between the parties hereto.  *Provided,* further, that as far as may be consistent with the interest of said company, it being the judge in these respects, the land, when the timber is removed, shall be left in a favorable condition for improvements, particularly with a view to the erection of other furnaces thereon.

"*Second.*—The party of the second part shall have in perpetuity the right, free of charge (except for land damages hereinafter mentioned), to mine, obtain, and use any ores or marbles found on said lands, or on any other lands now owned by the party of the first part in either of the townships above mentioned, provided it shall not mine or obtain any ores on said lands except what it shall actually convert into merchantable iron in its own establishment.  It shall also be at its own expense for mining, and shall not use or injure the improvements placed upon the lands by others without paying just and equitable damages therefor.  Neither shall it be entitled to take any more land to occupy than is clearly necessary to open the mine for the iron ore or marble to be obtained readily therefrom, and shall pay twelve dollars per acre for unimproved lands which it may require.

"These privileges shall only descend to the party of the second part's successors in corporate succession.

"The party of the second [first] part agrees not to in any wise convey the lands mentioned, except with a reservation of these rights and privileges to the party of the second part.

"These rights and privileges are made subject, however, to the terms of the prior deed of James L. Reynolds and wife to the party of the first part, by which he acquired title to the lands mentioned, which reservations were known prior to the executing of this indenture."

This instrument is known as the "Preliminary Agreement."

Immediately after the organization of the company, it issued a circular stating its object to be to engage solely and immediately in the production of pig iron, and its intention to confine its expenditures to the least amount necessary to enter upon the production of the single staple of pig iron. On September 26, 1859, the Pioneer Iron Company issued another circular, in which it was stated that the "cost of the two furnaces which it was thought most advantageous to erect (instead of one only, as originally contemplated), together with other unexpected outlays, had increased the expenditure nearly $30,000 beyond the capital of the company."

In May, 1857, the company had contracted for machinery, in June commenced the construction of its furnace, and when the 99-year lease was executed its construction was well advanced. Not long after its organization, the company made some explorations on the lands in controversy, but, discovering no ore of sufficiently good quality for use, abandoned further operations in that direction, and during its lifetime made no further effort to mine ore from its own lands for use in its furnaces. The company became financially embarrassed in 1866, and leased its own plant and all its lands and property, including the 99-year lease, to the Iron Cliffs Company, a corporation organized under the laws of this State. From that time the Pioneer Iron Company ceased to operate its furnaces.

Shortly after the lease to the Iron Cliffs Company, that company acquired the entire capital stock of the Pioneer

Iron Company, and continued to own it until after October 18, 1889. In 1867, the legislature passed an act authorizing the Iron Cliffs Company to acquire and hold stock in any company formed for manufacturing pig iron, wrought iron, or steel. On September 10, 1874, the Iron Cliffs Company mortgaged all its property, including the capital stock of the Pioneer Iron Company. The debt secured thereby was paid in 1889. At various times from 1858 to 1877, Harvey conveyed by appropriate deeds various parcels of the lands to other parties. The Pioneer Iron Company also made several conveyances. From 1866 to 1890 the Iron Cliffs Company operated the furnace. Afterwards it was operated by the Cleveland-Cliffs Iron Company, a corporation organized under the laws of West Virginia, until 1894, when that company dismantled the furnace, and has never rebuilt it.

Complainants are the owners by *mesne* conveyances of the mineral interests and reservations remaining in James L. Reynolds upon the execution of his deed to Harvey, and of the interest of Harvey by foreclosure proceedings upon a mortgage executed by Harvey to Edward Breitung, the father of the complainant Edward N. Breitung, execution sales against Harvey, and a quitclaim deed, executed by Harvey, of his interests in the lands. They and their lessees, beginning about 1870, have explored each 40-acre tract covered by the above 99-year lease, and have found ore on each tract upon which the defendants have entered for the purpose of exploration; have mined ore therefrom amounting to at least 3,000,000 tons, and have expended money thereon amounting to at least $700,000. These explorations were carried on openly and notoriously for more than 20 years.

The charter of the Pioneer Iron Company expired by limitation in 1887. No steps were taken to reorganize it until 1889. On October 7, 1889, a special meeting of the stockholders of the company was called, and the continuance of its corporate existence directed for a period of 30 years from the expiration of its former term. This action

was taken under an amendment to the Constitution.  On October 18th articles of reorganization were executed, and filed in the office of the Secretary of State April 8, 1890. On January 9, 1900, a notice in the name of the Pioneer Iron Company was served upon the complainants that it had entered upon certain of the lands in controversy (describing them) for the purpose of exploring for iron ore "to be used in the furnaces of the undersigned in said county, according to the grant made to the undersigned in the lease executed to the undersigned by Charles T. Harvey on the 17th day of September, A. D. 1857." Two similar notices were served later in regard to other lands. Thereupon, on March 9, 1900, complainants filed their bill in chancery, praying that the title to their lands be quieted, the title confirmed in them, and that the defendants be restrained from entering upon said lands to mine and remove ore.  Answers were duly filed, proofs taken, and decree entered for the complainants.

Complainants, in their bill and brief, state their position as follows:

"1. That Harvey acquired the indivisible, but not the exclusive, right to mine, free of royalty, for the purposes indicated, during his lifetime.

"2. That this special mining privilege was terminated and extinguished by a division of the estate, both Harvey and the Pioneer Iron Company having conveyed separate portions of the land to different parties; that, while Harvey's special privilege could be assigned as an entirety, it could not be cut up, and conveyed in separate parcels.

"3. The 99-year lease provides that the lessee should not 'mine or remove any ores on said lands except such as it shall actually convert into merchantable iron in its own furnaces and forges,' thus making the right appurtenant to said furnaces and forges.  The 'furnaces and forges' referred to have long since been dismantled and abandoned.  With their destruction and abandonment the incorporeal right to mine for their use ceased to exist.

"4. The lease provides that the rights and easements mentioned shall 'descend to the corporate successors of the company, but not to its assigns.'  The 30-year corporate term for which the company was organized expired

April 2, 1887, and all nonassignable incorporeal rights which it may have had at that time were thereby terminated. The company had no corporate successor.

"5. That the Pioneer Iron Company did not for more than 10 years next preceding the 2d day of April, 1887, carry on the business for which it was organized, and therefore was not authorized by Act No. 142 of the Public Acts of 1889 to reorganize.

"6. The Pioneer Iron Company has not been reorganized in compliance with law."

The defendants deny these contentions, and insist that:

"The deed of February 26, 1857, from Reynolds, conveys a fee-simple absolute to Harvey, 'his heirs and assigns,' not in the surface or part of the lands described, but in 'all the estate, right, title, interest, claim, and demand whatsoever' which Reynolds had therein. The clause referring to contract A does not express an exception to this grant, but merely relieves from the operation of the 'full warranty' of the deed the rights which the parties agreed in contract A that Reynolds (not his heirs and assigns) should have, or at most amounts merely to a reservation to Reynolds of an incorporeal hereditament comprising certain undiscovered mineral rights, and the right to acquire from Harvey, as owner of the fee, certain surface privileges by paying for them.

"The provisions of contract A, properly construed with the deed, and as a part thereof, constitute an agreement between the parties to the deed, by which Reynolds (not for his heirs and assigns) reserved to himself, or, more properly, acquired back from Harvey, certain mineral rights and rights of acquisition during his lifetime in the lands which he granted by the deed to Harvey and his heirs forever. By it Reynolds had an incorporeal hereditament (not a vested right in the land, for he had parted with all that), but a naked right to a share in minerals if discovered and reduced to possession, and a further naked right to buy back at a certain price such surface rights from Harvey as might be required to reduce such minerals to possession, if found. Harvey acquired no rights by contract A. The final proviso is not in any sense a grant from Reynolds, for he granted all he had in the deed. It merely defines the rights which Reynolds is reserving by explaining that his right to one-half the ore which may be discovered shall not require Harvey to account for ore which Harvey may use for manufacturing in Marquette county."

*S. W. Shaull* (*Arch B. Eldredge, Charles R. Brown, Benton Hanchett,* and *H. F. Pennington,* of counsel), for complainants.

*Frank A. Bell* (*Hoyt, Dustin & Kelley* and *Don M. Dickinson,* of counsel), for defendants.

GRANT, J. (*after stating the facts*).  1. It is urged that this bill cannot be maintained, because its main purpose is to declare a forfeiture of the 99-year lease, and that courts of equity will not enforce a forfeiture.   Counsel cite in support of this contention *Funk* v. *Haldeman*, 53 Pa. St. 229; 2 Story, Eq. Jur. § 1319; Bisp. Eq. § 181; 1 Pom. Eq. Jur. § 459; *Crane* v. *Dwyer*, 9 Mich. 350 (80 Am. Dec. 87); *White* v. *Railway Co.*, 13 Mich. 356.   The general rule is undoubtedly as stated in *Funk* v. *Haldeman*.   The statement by the court was not necessary to a decision of the case.   The court held that there was no violation either of tenure or covenants of the instrument which conveyed to Funk an incorporeal hereditament in fee, namely, the right to enter upon certain lands for the purpose of prospecting, boring, and taking away ore, oil, etc., out of the earth.   The claim was that Funk had subdivided that which he could only hold in entirety, and had, therefore, lost all.   At the close of the opinion the court said that, if Funk had lost his rights by the subdivision, "a chancellor would be likely to send the grantors into a court of law to enforce the forfeiture by ejectment; for equity does not, ordinarily, enforce forfeitures."   The case does not hold that in no case of forfeiture may a court of equity interfere.   Pomeroy states that those cases which appear to be exceptions to the rule are not so in reality.   Bispham says, "In some cases, however, the enforcement of a forfeiture may be regarded in equity with favor."   *Crane* v. *Dwyer* was an attempt to enforce in equity a forfeiture of a land contract, the vendee being in possession.   The forfeiture sought to be enforced in *White* v. *Railway Co.* was similar.   These cases are in accord with the general rule.   See, also, *Hodges* v. *Buell, ante,* 162 (95 N. W. 1078).

The supreme court of Pennsylvania, in *Brown* v. *Vandergrift*, 80 Pa. St. 142, stated the doctrine to be that equity "abhors a forfeiture when it works a loss, but not when it works equity, and protects the landowner against the indifference and laches of the lessee, and prevents a great mischief." In that case the lessee agreed to keep his lease good by a payment of $30 per month until he should commence operations, and, failing to do so, the lease was forfeited. He paid for 4 months; then failed to pay or to commence operations for 11 months. He sought to continue his lease by tendering payment for the 11 months. Equity interfered, and declared the lease forfeited.

In *Eberts* v. *Fisher*, 44 Mich. 551 (7 N. W. 211), this court, speaking through Mr. Justice CAMPBELL, said: "There is no rule that equity will not recognize a forfeiture when it is only one of the incidents of a past transaction." In that case it was held that the lease involved had expired by its own limitation, and, until renewed, had lost any efficacy.

Where a lessee has abandoned the premises, asserted no right under his lease for many years, and the lessor has been in exclusive possession, acting in apparent hostility to the lease, equity will interfere to prevent the lessee from afterwards attempting to take possession under the lease and asserting its existence. See *Detlor* v. *Holland*, 57 Ohio St. 492 (49 N. E. 690, 40 L. R. A. 266).

The bill in this case alleges exclusive possession for more than 15 years in the complainants; an abandonment by the Pioneer Iron Company of the lease for nearly 40 years; that the Pioneer Iron Company was dead by reason of the expiration of its charter; that the right to mine ore conveyed by the lease to the Pioneer Iron Company was appurtenant to the furnaces which it was then erecting; that said furnaces were dismantled in 1894; that no other furnace has been erected since; and that said right to mine ore, conveyed by said lease, was personal to the Pioneer Iron Company, and incapable of assignment.

We think, however, the main purpose of the bill is, not

to declare a forfeiture of the lease, but to determine the rights of the parties, which depend largely upon the construction of the deeds, the leases, and the various acts and conduct of the parties, extending over a period of more than 40 years, and to enjoin a continuing trespass. The case is one peculiarly appropriate to a court of equity.

The bill sets forth three notices in the name of the Pioneer Iron Company that it had entered upon the disputed lands for the purpose of mining iron ore. It is, therefore, apparent that numerous acts of trespass and the removal of valuable ore were threatened. The defendants are not in possession. The Pioneer Iron Company, through Mr. Duncan, its alleged agent, who is also agent and manager of the defendant companies, gave notice to the complainants that they had entered upon certain of these lands for the purpose of exploring for iron ore to be used in the furnaces, according to the grant made in the 99-year lease. Under this notice and all the others there was no claim of occupancy by the defendants or the Pioneer Iron Company by adverse possession. Whether or not, under these circumstances, ejectment would lie, we need not determine. Complainants being in possession of the property, if their title is valid, irreparable injury was threatened by the defendants. Such trespasses a court of equity will enjoin. 3 Pom. Eq. Jur. § 1357; *Stone* v. *Lumber Co.*, 59 Mich. 31 (26 N. W. 216); *Hall* v. *Nester*, 122 Mich. 141 (80 N. W. 982); *Halpin & Co.* v. *McCune*, 107 Iowa, 494 (78 N. W. 210); *Campbell* v. *Kent Circuit Judge*, 111 Mich. 575 (70 N. W. 141); *F. H. Wolf Brick Co.* v. *Lonyo*, 132 Mich. 162 (93 N. W. 251); *West Point Iron Co.* v. *Reymert*, 45 N. Y. 703; *Oolagah Coal Co.* v. *McCaleb*, 68 Fed. 86, 15 C. C. A. 270.

2. It is also urged as a fatal objection to the maintenance of the bill that the Pioneer Iron Company is not made a party. Under the allegations of the bill, and as well under the proofs, the Pioneer Iron Company is used as a "dummy" for the benefit of the defendant companies.

The defendants own, and have owned for many years, all its capital stock, its furnaces and property, both real and personal. They have managed all its affairs, and for their own benefit. All its accounts, if any have been kept in the name of the Pioneer Iron Company, have been kept upon the books of the defendants. The defendants refused upon the trial to produce the books of the Pioneer Iron Company, or their own books showing the accounts. Some of its officers having charge of the books were produced as witnesses, and testified to the above facts. Under these circumstances, these defendants cannot escape the consequence of their acts done in the name of the Pioneer Iron Company for their own benefit. Admitting that the Pioneer Iron Company is not a dead corporation, yet all its property, franchise, and rights are owned by the defendant companies, so far as the rights under the 99-year lease are concerned, and are fully represented by those now before the court.

The theory of the complainants, as stated in their bill, is that the Pioneer Iron Company is a dead corporation; that its charter expired by limitation April 2, 1887; and that no steps were taken for some time thereafter to reorganize the corporation under the amendment to the Constitution and the law; and that that action was wholly invalid. The Pioneer Iron Company, therefore, was not a necessary party. 15 Enc. Pl. & Pr. p. 627; *Hale* v. *Hale*, 146 Ill. 227 (33 N. E. 858, 20 L. R. A. 247). Complainants could not well have made the Pioneer Iron Company a party defendant without recognizing it as an existing corporation. Its existence was in issue, and, having expired by limitation of its charter, the burden of proof was upon the defendants to show a valid reorganization, so as to make it the successor of the company, within the terms of the 99-year lease. Equity will enjoin the threatened acts of those assuming to act within the name of a dead corporation. *Attorney General* v. *Railroad Co.*, 112 Ill. 520; *Brooklyn Steam Transit Co.* v. *City of Brooklyn*, 78 N. Y. 524.

3. The further answer to those objections to the jurisdiction of the court is that they should have been raised by demurrer. The facts upon which they are based are apparent upon the face of the bill. The defendants, having answered, put the case at issue upon the merits, and taken proofs upon that issue, cannot now raise the question of jurisdiction. *F. H. Wolf Brick Co.* v. *Lonyo, supra; Le Roy* v. *Platt,* 4 Paige, Ch. 81; *Livingston* v. *Livingston,* 4 Johns. Ch. 290 (8 Am. Dec. 562); *Waterloo Mining Co.* v. *Doe,* 82 Fed. 45, 27 C. C. A. 50.

4. *Construction of Deed from Reynolds to Harvey.* Whatever interests in the lands Reynolds reserved in himself, which were assignable by him or descendible to his heirs, the complainants own by appropriate deeds. Whatever interests are not now vested in the Pioneer Iron Company by the 99-year lease are also owned by complainants by appropriate conveyances from Harvey. The first important question, therefore, is, What interest did Reynolds convey to Harvey, and what did he retain in himself?

Defendants invoke the rule that deeds must be construed most strongly against the grantor. This rule cannot be invoked to defeat the intent of the grantor fairly gathered from the four corners of the instrument. Resort to this rule will only be had when other rules of construction fail. *Swan* v. *Morehouse,* 6 D. C. 228. Deeds are contracts, and, when courts can ascertain from the deed itself the intent of the grantor, the deed will be construed so as to give that intent effect, and that intent will be carried out "as the mass of mankind would view it," and not in accord with the technical definition of the words. A dispute raised between parties as to the meaning of the language of an instrument does not of itself create a doubt so as to admit the application of the rule defendants invoke. Therefore the definition agreement, dated February 1, 1871, between Reynolds and Harvey, specifically stating what interest Reynolds conveyed and what he retained (which agreement is referred to hereafter), does not of itself show a doubt as to the meaning of the

deed which the court will recognize as a reason for apply-ing the rule. If there is a doubt as to the meaning, courts will consider the situation of the parties, the subject-matter of the transaction, the acts, conduct, and dealings of the parties, in determining the meaning of any particu-lar clause. These rules of construction have been recog-nized and applied by this court in many cases. *Paddack* v. *Pardee*, 1 Mich. 421; *Norris* v. *Showerman*, 2 Doug. 16; *Bronson* v. *Green*, Walk. Ch. 56; *Vary* v. *Shea*, 36 Mich. 397.

It has often been held that to "reserve" means an ex-ception, and to "except" means a reservation. These words are not controlling, but will be construed in the light of the entire language of the deed. If the grantor, no matter what the words may be, retains in himself title to a part of the land described in the deed, it is an excep-tion. In such case words of inheritance are not necessary to retain in him the title for himself and his heirs. This is reasonable, because the deed did not purport to convey the title to the part excepted, nor to devest him of it. "Whatever is excluded from the grant by exception re-mains in the grantor as of his former title or right." *Stockbridge Iron Co.* v. *Hudson Iron Co.*, 107 Mass. 321. Where, however, the language constitutes a reservation,— *i. e.*, "when the thing which is to be the grantor's comes back to him from the grantee in the nature of a grant," such as rent, or other strictly incorporeal hereditament,— words of inheritance are essential to constitute a title to the thing reserved beyond the life of the grantor. 3 Washb. Real Prop. (5th Ed.) 465; *Lathrop* v. *Elsner*, 93 Mich. 599 (53 N. W. 791), and authorities cited; *Marvin* v. *Mining Co.*, 55 N. Y. 538 (14 Am. Rep. 322); *Sloan* v. *Furnace Co.*, 29 Ohio St. 568; *Whitaker* v. *Brown*, 46 Pa. St. 197; *Foster* v. *Runk*, 109 Pa. St. 291 (58 Am. Rep. 720).

The contract referred to in the deed is as much a part of the deed as if its provisions were incorporated in the deed, and the two will be construed as one instrument.

Reynolds did not convey the entire fee to Harvey, and then repurchase by the contract a certain interest in the lands.

Applying the above rules, we find no difficulty in construing the deed. It is entirely clear that Reynolds intended to convey a certain interest in the land to Harvey, and to retain the residue in himself. He carved the estate into two parts, conveyed one, and retained the other. One of the express considerations is "reserving to himself an undivided half interest in and to all the minerals which have been or may be discovered on the premises referred to as conveyed." Again, in the proviso, where Harvey is required to account for ore mined and sold not for his own use or for manufacturing purposes, Reynolds' interest is described as "his joint half interest therein." This language is susceptible of but one construction. It clearly shows that Reynolds conveyed to Harvey the title to one-half of the minerals, and retained the title to the other half in himself. The deed and contract were executed simultaneously. Harvey had nothing to grant till the delivery of his deed. When the deed was delivered, his contract was made a part of it, and he took only what the deed and contract, construed as one instrument, gave him. Reynolds burdened his half interest by conveying to Harvey the right to take without compensation any ore he might find and mine upon the premises for his own use, or for manufacturing purposes within the limits of Marquette county.

Some question subsequently arose between Reynolds and Harvey as to the true construction and effect of the deed, and therefore, on February 1, 1871, they executed an agreement known as the "Definition Agreement," in which, among other things, it was "declared and agreed that by said deed James L. Reynolds conveyed to Charles T. Harvey, his heirs and assigns, the entire surface of the lands described, and an undivided one-half of the minerals therein; reserving and excepting to the said Reynolds, his heirs and assigns, the other undivided one-half of said

minerals, together with certain rights and easements in the surface as appurtenant to said mineral right." This agreement was duly recorded March 7, 1871. It is not, of course, binding upon the defendants. It is, however, valuable as showing the understanding of Mr. Harvey, the witness upon whom the defendants largely rely to maintain their case, outside of their claimed construction of the instruments involved, without considering any extrinsic evidence.

In 1879 the Negaunee Iron Company filed a bill in chancery in the circuit court for the county of Marquette against Edward Breitung and others, asserting that "no estate of inheritance or other interest capable of being transmitted by inheritance, devise, or assignment" was reserved by or remained in said James L. Reynolds after the said conveyance to Charles T. Harvey of February 26, 1857, and prayed that the title of the complainant might be quieted as against the claims of Reynolds' heirs. Answer was duly filed, proofs taken, and the bill dismissed. The decree dismissing the bill was entered November 20, 1880. No opinion was filed, and the decree did not state the reason for dismissing the bill. The sole question, however, involved in the case was the construction to be placed upon that deed. It seems clear that the bill could not have been dismissed without determining this question. No appeal was taken, and the parties to that suit—the complainants here—have evidently acted upon the faith of that decree, and have expended very large sums of money in the purchase of these lands, in exploration, and the erection of mining plants. Complainant Breitung bought certain interests for which he paid $45,000, and his father bought the interest of Reynolds' heirs for $55,000. Several mining corporations have been organized, and valuable mines opened by them, upon the faith of the validity of complainants' title. While that decision may not bind the Pioneer Iron Company and the defendants, yet it is entitled to great weight, as it stood unquestioned for 20 years, and must have been known to

the officers of the Pioneer Iron Company and these defendants.

In 1889 the Arctic Iron Company filed a bill in equity against the Pioneer Iron Company, alleging the ownership by them as tenants in common of the minerals upon certain lands covered by the 99-year lease. The bill alleged that the Arctic Iron Company was the owner of the undivided half of the minerals, but that the title of said company was subject to the right of the Pioneer Iron Company to mine for its own use, or for manufacturing purposes within the county of Marquette. In its answer the Pioneer Iron Company averred that its ownership was subject " to the right of the said complainant [the Arctic Iron Company] to an undivided half of all the minerals which may have been heretofore discovered thereon or may hereafter be discovered thereon." This is a direct and solemn recognition in writing that Reynolds retained the title in fee to one-half of the minerals by his deed to Harvey.

Shortly before defendants served their notices in the name of the Pioneer Iron Company of entering upon said lands under the 99-year lease, they applied to complainants for options or leases, being refused which they attempted to enter under the 99-year lease. The conduct, therefore, of these defendants, is consistent only with the theory that they recognized the title to an undivided half of the minerals to be in these complainants.

5. *The Construction of the 99-Year Lease.* By the deed from Reynolds to Harvey, Harvey acquired the sole right to mine for himself and his assigns, free of cost or compensation, for the purposes specified. The right was an incorporeal and indivisible hereditament in Reynolds' undivided half interest. It gave Harvey no title to the ore in place. The word " sole," in the term "sole right," is not used in the sense that it excluded Reynolds from the right to mine, for the deed expressly conferred that right upon him. It is descriptive of the right Harvey had in the ore, and excludes any other right thereto in him.

The 99-year lease conveyed to the Pioneer Iron Company only an indivisible, incorporeal, and personal right to mine ore, and then only for such as it should actually convert into merchantable iron at its own furnaces or forges. It granted only certain rights and privileges for a specific purpose. It prohibited assignment, and the mining of ore for furnaces not owned by the company. It was not exclusive of the right of Harvey, his heirs and grantees, to mine for ore. Such rights may be assigned or conveyed in entirety, but not in severalty. "They may be appurtenant to another piece of land; as, for example, to a furnace property." Barr. & Adams, Mines, p. 53; *Silsby* v. *Trotter*, 29 N. J. Eq. 228; *Gloninger* v. *Coal Co.*, 55 Pa. St. 9 (93 Am. Dec. 720); *Harlow* v. *Iron Co.*, 36 Mich. 105, 121, and authorities cited; *Van Rensselaer* v. *Radcliff*, 10 Wend. 639 (25 Am. Dec. 582). Whether the effect of the conveyances made by Harvey to the Pioneer Iron Company and to others effected a division of this incorporeal hereditament, we find it unnecessary to determine, as the case will be disposed of on other grounds.

Was this right to mine ore under this lease appurtenant to the furnace then existing? It is true that the lease itself does not in express terms limit it to the then existing furnace. We must, therefore, look to the situation of the parties, the object in contemplation, and the surrounding circumstances, in determining the question. The lease speaks in the present tense. The furnace, with its two stacks, was then in existence. If, instead of the lease, Mr. Harvey had made a contract on September 17, 1857, to supply the furnace or furnaces of the Pioneer Iron Company with iron ore sufficient for its use, clearly such contract would be held to mean the furnace or furnaces as it or they then existed. If A. enter into a contract with B. to supply B.'s flouring mills for a series of years with sufficient wheat to keep them running, and B. have two mills, clearly the contract would mean that A. should supply B. with wheat for the mills then erected, and not for the mills

he might thereafter erect. The same rule would hold if B. obtain from A. the right for a series of years to enter upon A.'s land and raise wheat for use in his mills. Harvey and the Pioneer Iron Company were dealing with things as they existed, and not with things that might exist thereafter.

The preliminary agreement executed at the same time of the deed by Harvey to the Pioneer Iron Company limited the right to use the ores mined "to its [the Pioneer Iron Company's] own establishment." A furnace may have one stack or more, in which case it is sometimes called furnaces, and sometimes a furnace with stacks of a specified number. The Pioneer Iron Company's articles of association provide for only one furnace. They state the purpose for which the corporation was organized to be that "of procuring a suitable location for a manufactory, and lands to furnish coaling facilities therefor, in the Upper Peninsula of the State of Michigan, and working the same for the production of merchantable iron" In each of the three written instruments, viz., the preliminary lease, the articles of association, and the 99-year lease, different terms are used interchangeably, meaning the same thing, viz., a furnace for the manufacture of pig iron. The circulars sent out by it on the formation of the company refer to but one furnace. If the above facts were insufficient to establish the character of the furnace with reference to which the parties contracted in the lease, its character is conclusively established by the contract made April 25, 1857, by the Pioneer Iron Company with the Jackson Iron Company, by which the latter agreed to supply the former with ore for the manufacture of pig iron. It was recited therein that the Pioneer Iron Company proposed "to erect and build a blast furnace establishment of one or two stacks for manufacturing pig iron near the Jackson Iron Mine."

Is it reasonable to suppose that Harvey intended to confer upon the Pioneer Iron Company the right to erect as many furnaces as it chose, and obtain ore for them all

from this land ? If this be the construction of the lease, then Harvey conveyed to the company the right to use all the ore found in his land, provided it could erect enough furnaces to use it. It is unreasonable to hold that such was the intent of the parties. The undoubted consideration for this lease was the exploration and development of iron ore upon the lands by the company, the discovery and development of which would redound to the benefit of the lessor. There must have been some consideration moving from this company to Harvey to induce him to make the lease, other than the nominal consideration expressed in it. The learned counsel for defendants attempt to show that the $25,000 paid for the deed was also the consideration paid for the lease. The record fails to establish any such claim. On the contrary, it conclusively appears that the standing timber upon the lands conveyed by the deed was then worth more than the $25,000, the consideration expressed therein and paid. Furthermore, Harvey, one of the company's incorporators, its agent and its witness, testified positively that but one furnace was in contemplation when the articles of association and the 99-year lease were executed. We therefore conclude that the Pioneer Iron Company contemplated, provided for, and erected only one furnace, with two stacks; that the parties contracted with reference to that furnace; and that the mining right conveyed was appurtenant to the furnace.

6. By the voluntary act of the defendant companies, who, since 1866, operated it, the furnace was dismantled in 1894, and totally destroyed. It has never been rebuilt, and there evidently was no intention to rebuild it. The abandonment and destruction of the furnace also destroyed the appurtenant right to mine the ore under the lease. Nothing was left for the right to be appurtenant to. When the principal is destroyed, the appurtenant rights go with it; or, as one author puts it, "when the substance disappears, its shadow vanishes." *Day* v. *Walden*, 46 Mich. 575 (10 N. W. 26); *Jones* v. *Van Bochove*, 103 Mich. 98 (61 N. W. 342). The doctrine of abandonment is suffi-

·ciently discussed in these two cases and the authorities there cited.

7. Soon after the execution of the 99-year lease, the Pioneer Iron Company made some explorations upon certain portions of the land covered thereby, found ore, but not in paying quantities, abandoned the explorations, and for full 43 years made no other attempt to avail itself of this mining right. In 1866 it conveyed to the Iron Cliffs Company by lease for a period of 10 years "all its ironworks, buildings, lands, and rights," etc. (reserving, however, certain rights and privileges not necessary to mention), and provided by the lease that dividends should be paid directly to its stockholders, rather than into its treasury. The Iron Cliffs Company afterwards became the owner of all its ·stock, and thereafter carried on the furnace business. The Pioneer Iron Company never thereafter took any control of its furnace. It was regarded as merged in the Iron Cliffs Company. So notorious was this that, in the year 1877, the commissioner of mineral statistics, in his first annual report, speaking of this company, said: "The Pioneer Iron Company, by whom the furnace was built, became subsequently merged into the Iron Cliffs Company." In subsequent reports it was referred to as "absorbed by the Iron Cliffs Company." The officers of the Pioneer Iron Company thereafter neither made nor filed any reports as the law expressly required them to do. Meanwhile, commencing about the year 1870, the grantees of Reynolds and Harvey, through themselves and other parties, spent large sums of money in exploration, and discovered in subsequent years valuable deposits; mining corporations were formed, and leases made to them, and valuable mines developed by them; during all of which time the Pioneer Iron Company stood by in silence, asserting no right under its lease. Whether such nonuser amounted to an absolute abandonment, under the rule in *Day* v. *Walden, supra,* we need not determine. That leases of this character may be abandoned and forfeited by nonuser is established in *Porter* v. *Noyes,*

47 Mich. 55 (10 N. W. 77), at least as to those who have purchased or leased from the lessor, entered upon the land, developed mines, and made valuable improvements. There is certainly force in the claim that a personal, unassignable, and incorporeal right to take ore appurtenant to a furnace is abandoned by the failure to exercise that right for 43 years; especially where the right was once exercised and abandoned. Whatever may be the rule as between the lessor and the lessee where neither has taken any steps to exercise the right to mine, as between such lessee and subsequent lessees and grantees of the lessor, who have in good faith expended large sums in developing mines, the lessee is estopped to assert his personal and incorporeal right. In an opinion obtained by the complainants in 1890 from Mr. W. P. Healy, a lawyer, who was once interested in these lands, he said: "I am also clear that the Pioneer Iron Company can never enter and appropriate the discovery of another. They cannot stand by until others have discovered a valuable deposit of ore, and then commence mining a portion of it,"—which opinion meets our approval. The case of *East Jersey Iron Co.* v. *Wright*, 32 N. J. Eq. 248, is similar in many respects to this case, and the language there used is equally applicable here:

"There are persons who will stand by and see large expenditures incurred in such operations, intending, if the venture turns out successful, to set up a claim, but, if otherwise, to have nothing to do with it. Such persons have no right to the aid of a court of conscience."

8. The charter of the Pioneer Iron Company expired by limitation April 2, 1887. The Constitution, at the date of its organization and at the expiration of its charter, expressly prohibited the organization of corporations beyond the period of 30 years. No provision then existed, either by the Constitution or by the statute, authorizing a reorganization of corporations which had expired by limitation. A constitutional amendment was adopted in 1889, authorizing the legislature to provide by general laws for one or

more extensions of the term of such corporations, and also for the reorganization ''for a further period, not exceeding 30 years, of such corporations whose terms have expired by limitation, on the consent of not less than four-fifths of the capital.'' Const. Mich. art. 15, § 10. Pursuant to this authority, the legislature, in 1889, passed an act authorizing such reorganization. 2 Comp. Laws, § 7035. Very important questions are raised by counsel as to the effect of this reorganization statute, the validity of the act of reorganization by the Pioneer Iron Company, as to whether the Pioneer Iron Company was in position to avail itself of this statute, and also the effect upon the 99-year lease should the reorganization be held to be valid. Inasmuch, however, as these questions are not essential to a decision of the case, we refrain from determining them.

Decree affirmed, with costs.

The other Justices concurred.