FRANK WARD, APPELLANT, V. WILLIAM WARD ET AL.,
APPELLEES.

FILED MAY 5, 1910. No. 15,953.

1. **Deeds:** CANCELATION: MENTAL CAPACITY. Mental incapacity to exe-
cute a deed is not established by proof that the grantor was ec-
centric, quick-tempered, profane, advanced in years, and in a
degree influenced to make the conveyance by prejudice against a
son, stepson and his wife, where it further appears that he knew
the value of property generally, exercised good judgment in pur-
chasing merchandise for himself and family, remembered the
exact amount of his financial obligations, and paid them promptly,
deliberately determined for himself the disposition he desired to
make of his property and carried out his purpose by executing
the deed in question.

2. ———: DELIVERY. Where the delivery of a deed is in issue, proof
that the grantor admitted he had delivered the instrument, and
thereafter he commenced an action to cancel it for reasons other
than nondelivery, justifies a finding that the instrument was
delivered.

3. ———: FRAUD: PARENT AND CHILD: PRESUMPTIONS. A presump-
tion of fraud or undue influence does not arise solely by reason
of the fact that a deed from a parent to his child was voluntary.

APPEAL from the district court for Cedar county: GUY
T. GRAVES, JUDGE. *Affirmed.*

*J. L. Kaley,* for appellant.

*J. C. Robinson* and *T. E. Brady, contra.*

ROOT, J.

This is an action in equity to cancel a deed made by
John Ward, the plaintiff's father, to the defendant Wil-
liam Ward, another son of the deceased. The defendant
prevailed, and the plaintiff appeals.

John Ward, the litigants' common ancestor, was a par-
simonious, quick-tempered, odd-appearing, eccentric, illit-
erate old man. He was a firm believer in the efficacy of
outspoken prayer, but prone to lapse into profanity if ir-

ritated or annoyed. In 1887 John Ward's first wife died. Two sons survived her, the plaintiff, 14 years of age, and the defendant William Ward, 22 years of age. John Ward emancipated his son Frank at this time, and from thenceforward this son did not contribute to his father's support or estate; but became improvident and dissipated. William Ward, after he became 16 years of age, and until his mother's death, performed most of the labor on his father's farm and thereafter contributed to that parent's support. After his first wife died John Ward moved to Dunlap, Iowa, and again married, but did not dwell in harmony with his wife. He became extremely exacting concerning his household expenses, charged his wife with extravagance, and their family life was so discordant that she secured a divorce from him. Subsequently Ward and his second wife remarried, and thereafter he commenced, but did not prosecute to a conclusion, an action for a divorce. John Ward's charges against his wife seem to have been without foundation, but he continued his vindictive, unreasonable course toward her, so far as the record discloses, during the remainder of his life. Ward frequently announced that his wife should not receive any of his estate, for the alleged reason that her son by a former marriage and her other relatives would induce her to transfer the property to them and would squander it.

1. The plaintiff contends that his father in 1899, the year the deed in question was executed, was of unsound mind and mentally incompetent to execute a deed. During the trial of this case two witnesses testified that John Ward would become bewildered and unable to find his residence in Dunlap. His widow, her relatives, and other witnesses of evident intelligence, testified that in 1899, and up to the time of his death, he was insane. A much greater array of witnesses, including physicians who had treated John Ward for minor infirmities, his comrades in a G. A. R. post, merchants with whom he dealt, members of his church, and intimate acquaintances who had known him and observed his conduct for from

10 to 25 years, testified that while he was eccentric, quick-tempered, and at times profane, he was during said period blessed with a retentive memory, was exacting and shrewd in matters touching his financial interests, and was competent to transact business. In 1897 John Ward conveyed his Dunlap property, which was worth but $300, to his son William, subject to a life estate reserved to Mrs. John Ward. The record does not disclose whether this was a voluntary conveyance, but such an inference may be drawn from the evidence. In 1899, while William Ward was in the United States army in Cuba, he sent his father money at different times, and their relations at all times seem to have been pleasant and friendly. In April of that year John Ward requested an attorney to prepare a deed conveying the land in controversy to his son William. The instrument was prepared by the scrivener, and signed and acknowledged by the grantor, but remained in the attorney's custody until June of that year. During this month William called upon his father, and shortly thereafter the deed appeared in the son's possession. At all times thereafter William controlled the land and claimed to own it. At the time this instrument passed into William's custody his father was living apart from his wife, and John Ward's landlord testifies to a conversation between William and his father, wherein the son insisted the deed should be delivered to him, and promised as a consideration for the land to furnish his father support and to give him a suit of clothes. William denies making these statements, and there is evidence in the record discrediting the landlord's testimony to such a degree that we are not inclined to give it much credence. Subsequently John Ward remained for a time in Dunlap, then boarded with a niece in South Omaha, thereafter lived for a time in the soldiers' home in Milford, then removed to a like institution in Leavenworth, and from thence went, or was taken, to Washington, D. C., where he departed this life in 1904, insane, so one witness testifies. In 1901 John Ward commenced an

action in Cedar county to set aside said deed, for the alleged reason that it was executed in consideration of support which the grantee had withheld. Seven months thereafter the plaintiff in that action dismissed his suit. The record is replete with evidence concerning John Ward's declarations; some of them admissions against interest, others self-serving in character, but all of this testimony was received without objection and will be considered in determining the issues joined.

From this evidence it appears that John Ward said on one occasion that he made the deed to "beat" his wife, and now Will was trying to "beat" his father; that he intended to recover his land if he had to shoot his son to secure it. Other witnesses testify to the grantor's repeated statements that Will had been a good boy, had given his earnings to and had cared for his father, was prudent in money matters, and he intended William should have the farm because he would care for it, whereas Frank was dissipated and would squander it. The court refused to permit William to testify concerning money paid or other consideration moving from him to his father, but there are many facts and circumstances testified to by other witnesses tending strongly to prove that William had contributed to his father's support both before and after the deed was made. The plaintiff challenges the competency of two physicians to testify for the defendant, but, excluding their testimony, there is sufficient evidence in the record to satisfy us that John Ward, in 1899, knew and understood the nature and quality of, and was competent to make, the instrument assailed. After said deed was executed the defendant William Ward, for a consideration satisfactory to Mrs. Ward, secured a deed from her for the land in dispute, and she is not complaining because her husband conveyed the real estate to his son.

2. The contention that the evidence does not establish a delivery of the deed is not well taken. The plaintiff's witness, Cane, states that John Ward told him he had

given the deed to his son, and the suit commenced in 1901 to annul that instrument recognizes the delivery of the deed.

3. It is further argued that the deed was the result of undue influence exerted by the grantee upon his father. The record is barren of any evidence tending to show that William Ward coerced his father to execute the deed. The proof will not sustain a finding of undue influence within the meaning of the law. *Latham v. Schaal*, 25 Neb. 535; *Boggs v. Boggs*, 62 Neb. 274.

4. Finally it is urged, with great learning and force, that since the conveyance was voluntary, unfair to the grantor and to the plaintiff, and was made under suspicious circumstances, it ought not to be permitted to stand. In *Gibson v. Hammang*, 63 Neb. 349, we held the mere relation of parent and child in a deed wherein the parent was grantor did not raise a presumption of fraud or undue influence. See, also, *Chambers v. Brady,* 100 Ia. 622; *Mallow v. Walker*, 115 Ia. 238; *Millican v. Millican,* 24 Tex. 426. In *Gibson v. Hammang, supra,* we further held that where a voluntary conveyance of property from a parent to a child is unjust to the other children, is an unreasonable disposition of the donor's property, and the circumstances surrounding the execution of the instrument suggest fraud and undue influence, the transaction should be closely scrutinized; that the donee in such a case should assume the burden of proving that the conveyance was the result of the grantor's deliberate, unhampered judgment free from all improper influences on the part of the grantee. In the cited case, the grantee importuned her mother to make the deed, insisted upon its execution, and the suit to annul the conveyance was prosecuted by the grantor. In the case at bar, the grantor upon his own motion, without any suggestion from the grantee, while the latter was thousands of miles distant, conceived the idea of making the deed, and the conveyance was prepared by one of John Ward's disinterested personal friends. Doubtless John Ward was im-

pelled to make the deed by his antipathy to his wife and her relatives, but one has a right to follow the inclinations of his heart in the distribution of his property as well as in the other affairs of life, and the courts, in the absence of fraud or imposition, will not ordinarily interfere at the suit of an heir, not a creditor of the grantor, to thwart that disposition. *Mackall v. Mackall,* 135 U. S. 167. The conveyance did not strip the grantor of his financial resources, because he was paid a pension of $17 a month. Independently of his discontinued suit to set aside the deed and his declarations made after the deed was delivered, there is no evidence to justify an inference that he was not satisfied with the transaction. In considering the commencement of the suit, we take into consideration evidence to the effect that John Ward was litigious, inclined to institute suits and before the day of trial to dismiss them, and it is not improbable that, had William paid his father the value of the land in consideration of the conveyance, the old gentleman would have expressed dissatisfaction with the deal and have commenced a suit to recover the farm. If John Ward were pressing this suit, a different question would be presented from the one under consideration. In the instant case there are equities in favor of the defendant William Ward arising from the fact that the plaintiff was emancipated when 14 years of age, and never, so far as the record discloses, thereafter contributed a penny to his father's support or in any manner ministered to that parent's comfort, mental or otherwise; whereas the defendant William Ward toiled for his parents until he was 22 years of age, and thereafter contributed to his father's support and maintenance. As stated by Judge Green in *Simon v. Simon,* 163 Pa. St. 292: "Equity will, upon proper occasion, intervene and set aside voluntarily executed deeds and other instruments, yet the power to do so is of an exceedingly delicate character, not to be lightly exercised, and only to be invoked when the manifest justice of the case requires it." See, also, *Carney v.*

*Carney,* 196 Pa. St. 34; *Millican v. Millican, supra; Wessell v. Rathjohn,* 89 N. Car. 377; *Dickerson v. Evans,* 84 Ill. 451. Upon the entire record, we are of opinion that the manifest justice of this case dictates that the deed of John Ward should be upheld.

The judgment of the district court, therefore, is

AFFIRMED.