DEMERSE *v.* MITCHELL.

1. PARTIES—JUDGMENT—CANCELLATION OF INSTRUMENTS.
   Complainants, who were not made parties to a suit to determine mineral rights in lands, were not bound by the decree entered therein.

2. DEEDS—ESTATES BY THE ENTIRETIES—HUSBAND AND WIFE—RESERVATIONS.
   Where a wife, who has only an inchoate right of dower in lands, joins with her husband in conveying same, reserving the mineral rights, the presumption is that she joined merely for the purpose of subjecting her dower, and not to create an estate by the entireties in the mineral rights.

3. SAME—WAIVER—CONDITIONAL TRANSFER—ESTOPPEL.
   Where a husband, who had conveyed lands to his wife upon condition that she would furnish support for him during

his life, negotiated a transfer of the property by her, by warranty deed, and later quitclaimed to the same grantees, he is *held* to have waived the further performance of the condition, so far as third parties might be affected.

4. SAME—AFTER-ACQUIRED TITLE.
   If the wife did not own the lands unconditionally at the time of the transfer, she afterwards became the owner in fee by her husband's devise, and her title inured to the benefit of her grantees under her warranty.

5. SAME—FRAUD—CANCELLATION OF INSTRUMENTS—EVIDENCE.
   In a suit to cancel a deed on the ground of fraud, evidence *held*, not to support the allegations of fraud and deceit alleged in the bill.

6. SAME—MENTAL CAPACITY—INSANE PERSONS.
   Evidence that grantor was queer, eccentric, unreasonable in his conduct, harsh, of violent temper, and disposed to act in all things in opposition to the comfort, peace, and happiness of his family, is not sufficient to show want of capacity to convey real property, where the evidence shows a long list of real estate and other important business transactions during the period when it is now claimed he was incompetent.

Appeal from Marquette; Flannigan, J. Submitted November 19, 1914. (Docket No. 86.) Decided September 28, 1915. Rehearing denied June 23, 1916.

Bill by Abilene Demerse and others against Elizabeth Mitchell and others for the cancellation of certain deeds. Defendants filed an answer in the nature of a cross-bill. From a decree for defendants, complainants appeal. Affirmed.

*J. L. Heffernan,* for complainants.

*S. W. Shaull, William P. Belden,* and *Horace Andrews,* for appellees.

KUHN, J. After a careful consideration of the briefs in this case and a study of the record, we find that we are in entire accord with the learned trial judge upon

his conclusions as to the facts and the legal questions therein involved. After having heard the case, the trial judge has given us the benefit of a carefully prepared and exhaustive opinion, of which we will adopt so much as is essential to a decision of the questions at issue:

"In the year 1866, Charles T. Harvey surveyed and laid out into lots, numbered from 1 to 13, inclusive, portions of sections 5 and 6, in township 47 N., of range 26 W., Marquette county. A plat of these lots, which was made by Mr. Harvey, was not recorded, and while, as a rule, they are described in the various conveyances by metes and bounds, they are commonly known by their respective numbers.

"At the date of the plat Mr. Harvey was the undisputed owner of the entire surface and of an undivided half of the minerals of the 13 lots. His ownership of the remaining undivided half of the minerals was disputed. Such dispute continued for many years, and was not finally settled in favor of the grantees in the Harvey chain of title until the decision of *Pellow* v. *Arctic Iron Co.*, reported in 164 Mich. 87.

"The title of Harvey to lot 11 was acquired by Jean Blais in 1867, the title to lot 8 in 1869, and the title to lot 9 in 1871, through mesne conveyances in the regular chain of title. Lot 13 did not pass in the regular chain of title to Jean Blais. In 1867 Harvey conveyed that lot to one Anna Collins, who allowed it to go delinquent for taxes for the years 1875 to 1880, inclusive, with the result that it was sold for the taxes of those years, and the auditor general issued a tax deed thereof, dated September 12, 1884, to Samuel E. Byrne, of Marquette, Mich., who, with his wife, conveyed to Jean Blais. On January 19, 1885, Jean Blais conveyed lot 13 by special warranty deed to his wife, Zoe, who reconveyed to him on or about March 1, 1888.

"In 1883, Jean Blais and Zoe Blais, his wife, conveyed by warranty deed to John S. Newberry and Hugh McMillan, trustees, for right of way for the Detroit, Mackinaw & Marquette Railway Company, a portion of lots 8, 9, and 11. On July 16, 1884, they conveyed by warranty deed to Joseph H. Primeau a part of lot 9, comprising about half an acre, and on the same day

they conveyed to their son, Joseph Blais, another part of lot 9. From the grants to Newberry & McMillan, trustees, Joseph H. Primeau, and Joseph Blais, the ores and minerals were excepted.

"Besides other lands comprising about 160 acres and not included in this litigation, Jean Blais, by warranty deed, executed May 7, 1885, conveyed to his wife, Zoe, all of lots 8 and 9 not previously conveyed to Newberry and McMillan, trustees, Joseph H. Primeau, and Joseph Blais. The consideration recited in that deed is the sum of $1,500, and the obligation assumed by Zoe, the grantee, 'to keep and provide comfortably for the maintenance and support' of her husband during his life, and the deed provides that, in the event of her default in that regard, it was to be treated as a mortgage subject to foreclosure, 'in the same way as mortgages on real estate are foreclosed.'

"March 30, 1887, Zoe Blais executed and delivered to Samuel and George Mitchell a warranty deed of lot 8, except the railroad right of way previously conveyed to Newberry and McMillan, trustees, and also excepting the surface of another small part of the lot. On the same day she executed and delivered to the same persons a warranty deed of lot 9, excepting the surface rights therein previously conveyed to Newberry and McMillan, trustees, Joseph H. Primeau, and Joseph Blais. On the same day Jean and Zoe joined in a warranty deed to Samuel and George Mitchell, conveying lot 11, excepting the railroad right of way of Newberry and McMillian, trustees, and also excepting the surface of a small part of the lot outside the railroad right of way. On the same day, March 30, 1887, Jean Blais executed and delivered to the Mitchells a straight quitclaim deed of lots 8 and 9, without exception or reservation of any surface, minerals, or other rights. The consideration expressed in each of the three warranty deeds is $925, and in the quitclaim deed $1; but the fact is these deeds represented a single transaction, and the consideration paid by the Mitchells for the four deeds was above $2,400. The small surface rights excepted by Zoe in her deed of lot 8 and the other small surface rights excepted by the deed of lot 11, were subsequently sold, and by mesne conveyances acquired by the Mitchells.

"There existed through many years a lack of har-

mony between Jean and Zoe. They separated and re-
joined several times. They were separated when the
deed of May 7, 1885, was executed, and, while the fact
does not appear on its face, it is evident from surround-
ing circumstances that that deed was intended as a sort
of a separation settlement. Subsequently they became
reunited, and were living together when the four deeds
to the Mitchells were executed and delivered. The
reconciliation, unfortunately, was not lasting, and on
the 5th day of March, 1888, they finally separated. On
that day they executed articles of separation whereby
Zoe, in consideration of the lands theretofore and other
lands at the date of the articles conveyed to her by
Jean, released her claims for maintenance and her
right of dower in all lands of which Jean remained
seized or might thereafter acquire. The execution of
these articles had the effect to release the right of
dower of Zoe in lot 13.

"By a deed executed in September, 1888, by another
executed in December, 1888, and another executed in
December, 1890, Jean Blais conveyed to third parties
all of lot 13, surface and minerals, except the minerals
in a portion of the lot measured by the width of the lot
and 32 rods in length, which minerals he quitclaimed
on July 22, 1899, to Louis Corbett. Corbett purchased
the estates in lot 13 previously conveyed by Blais. He
also purchased from Anna Collins, and so became, not
only the owner of all the right and title acquired by
Blais under the tax deed, but of the government title
as well.

"Jean Blais died May 18, 1901. By his last will
which was executed October 10, 1882, he left all of his
estate, real and personal, to his wife, Zoe, absolutely,
except a small bequest of money to each of the children.
The will was admitted to probate June 16, 1902, and
execution thereof was committed to the widow, Zoe,
who, surviving her husband about two years, died in-
testate. In 1905, Pickands, Mather & Co. obtained from
the Mitchells an option for a mining lease of lots 8, 9,
and 11. After conducting extensive and costly explora-
tory operations on the property, they transferred the
option to the defendant, the Athens Mining Company,
which last-named company, in 1906, took a mining
lease of the property. In December, 1906, Louis Cor-
bett and his wife, the defendant Marie Corbett, exe-

cuted and delivered to the Cleveland-Cliffs Iron Company a mining lease of lot 13.

"At all times, from the date of the Harvey purchase in 1857 until the year 1911, the ownership of one-half the minerals in lots 8, 9, and 11 was in controversy, and from 1905 until 1911 in actual litigation between the Mitchells and the Arctic Iron Company. The litigation was finally terminated by a decree of the Supreme Court establishing in the Mitchell heirs the title to the lots in fee, 'together with all the minerals thereon and therein contained.' The heirs of Jean and Zoe Blais were not parties to that litigation, and therefore the decree therein did not bind them. The lots of the Harvey plat not involved in these suits were acquired by the Arctic Iron Company. The ore underlying the lots of the Harvey plat is a continuous body, and could not have been mined out, either safely or economically, by operations conducted by the various owners on their respective lots, and following the entry of the decree of the Supreme Court in the *Arctic Iron Co. Case,* negotiations were opened which finally resulted in the various owners of the 13 Harvey lots and the Cleveland-Cliffs Company as lessee of lot 13, conveying to the Athens Mining Company; the object being to form of the separate holdings a single mining property, and thus avoid the great danger to life and limb and the heavy cost which would attend separate mining. George Mitchell died April 6, 1905, intestate; Samuel Mitchell died May 9, 1908, testate; and Louis Corbett died January 14, 1910, testate.

"To set aside the deeds from Jean and Zoe Blais to the Mitchells, and the deed from Jean Blais to Louis Corbett, and to establish the title to the property described in such conveyances in themselves, the heirs at law of Jean and Zoe and William C. Foard, who, under quitclaim deeds from the Blais heirs, claims an undivided one-half interest in the lands, filed their bills of complaint against the heirs and devisees of George and Samuel Mitchell and other defendants, and the Athens Mining Company, and against Marie Corbett, sole devisee of Louis Corbett, and other defendants, and the Athens Mining Company. The defendants claimed for their respective answers the benefits of a cross-bill. Both suits were heard together. The proofs were taken in open court, except certain depo-

sitions, which were read in evidence, as was also the testimony of Samuel Mitchell, given in the suit of *Pellow* v. *Arctic Iron Co., supra.*

"The propositions advanced by the bills of complaint to substantiate the complainants' claim of title are in substance that Jean and Zoe held the minerals underlying certain portions of the surface of lots 8 and 9 as tenants by the entireties, and their separate deeds thereof to the Mitchells were, for that reason, ineffectual to pass the title; that the deed of May 7, 1885, of lots 8 and 9, from Jean to Zoe, was void for uncertainty of description; that, if not void for the reason mentioned, in legal effect it was but a deed on condition, the terms of which were never carried out by Zoe; that whether the title to the lots in question was in Jean, or partly in Jean and partly in Zoe, their deeds were ineffectual, because, as it is claimed, at the time of the execution of the deeds to the Mitchells, both Jean and Zoe were, and when he executed the deed to Corbett Jean was, of unsound mind and incompetent to execute such deeds; and that the Mitchells and Corbett knew of the incapacity of both Jean and Zoe, and wilfully deceived them regarding the value of the properties, and thereby obtained what they knew to be exceptionally valuable properties for a mere pittance.

"A clause will be found in each of the deeds from Jean and Zoe to Newberry and McMillan, trustees, Joseph H. Primeau, and Joseph Blais, of parts of lots 8 and 9, reading in substance as follows:

" 'Saving and reserving, however, unto the said parties of the first part, and to their heirs and assigns, forever, all ores and minerals on or beneath the surface of said lands, together with the right to enter upon said lands and explore the same therefor and to mine the same without let or hindrance.'

"The contention of the complainants' counsel is that, although it be conceded Zoe joined in the execution of these deeds for the purpose merely of releasing her dower, nevertheless the legal effect of the quoted clause was to constitute her a tenant by the entirety with her husband in the minerals underlying the surface deeded. It is not recalled that during the oral argument counsel for the complainants referred to this subject. Many pages of his brief are devoted to rules and decisions

187 Mich.—44.

relating to the alienation of estates by entirety, which would be interesting, once a tenancy of that character, in Jean and Zoe, was established; but upon what principle of law the clause may be given the effect claimed the brief is profoundly silent. That the legal effect of a clause such as is found in the Newberry and McMillan, Primeau, and Joseph Blais deeds is to separate the surface and mineral estates, and to pass only the surface estate, was settled in *Negaunee Iron Co.* v. *Iron Cliffs Co.*, 134 Mich. 264 (96 N. W. 468) ; and where the wife has no interest other than an inchoate right of dower in lands conveyed by a deed, in which she joins with her husband, the presumption must be that she joined merely for the purpose of subjecting her dower, and plainly the intention and effect of such a clause, in a deed executed by the husband and wife, is not to create in the thing excepted any new right in the husband or wife, but to preserve in each the same rights each had therein before the execution of the deed.   *   *   *

"The uncertainty of description which appears in the record of the deed of May 7, 1885, and which was supposed by the complainants to render that deed void, was discovered, on the introduction of the original deed, to have been an error in transcribing.

"The deed of May 7, 1885, was upon condition that Zoe would furnish support for Jean during his life. There is no warrant for saying Zoe did not, up to the time of the transfer to the Mitchells, perform the condition. Her conveyance to the Mitchells was made, not only with Jean's full approval, but was mainly negotiated by him, and so it may be said he waived the further performance of the condition, at least so far as third parties might be affected who were dealing with both of them respecting the title. If the further performance of the condition was not waived at that time, it certainly was later. The articles of separation and the deeds exchanged between them in the plan of separation leave no doubt of the release of Zoe respecting that condition. If, however, Zoe did not own lots 8 and 9 unconditionally, at the time of the transfer to the Mitchells, or following the articles of separation, she did become the owner thereof in fee upon the probate of Jean's will, and in either case her title acquired

after the delivery of her warranty deeds to the Mitchells would inure to their benefit.

"In the view of the case taken by the court, the legal effect of the clause of the deed of May 7, 1885, providing for the support of Jean, as well as the question whether that condition was performed, are not important matters. If at the time of the transfer to the Mitchells lots 8 and 9 were owned by Zoe, they passed under her warranty deeds. If at that time they were not owned by Zoe, and were owned by Jean, they passed under his quitclaim deed, and if for any reason it may be said his quitclaim deed was ineffectual to pass the title if he owned it then the absolute unincumbered title passed to Zoe under the separation agreement, and, if not, then under his last will, which title, however, or whenever, she received it, inured by operation of law to the benefit of the Mitchells. *Lee* v. *Clary,* 38 Mich. 223; *Morris* v. *Jansen,* 99 Mich. 436 (58 N. W. 365); *Duffy* v. *White,* 115 Mich. 264 (73 N. W. 363). The question of a tenancy by the entirety does not go to the minerals underlying the surface conveyed to Newberry and McMillan, trustees, in lot 11, since that lot was conveyed by deed in which Jean and Zoe both joined, nor does it concern lot 13, which, when conveyed by Jean, was owned by him absolutely, relieved even from the inchoate right of dower of Zoe by virtue of the separation agreement, and the only questions to be considered are whether, in obtaining the deeds of lots 8, 9, and 11 from Jean and Zoe, either of the Mitchells, or in obtaining the deed of lot 13 from Jean, Corbett practiced any fraud or deceit, and whether, when such deeds were executed, the grantors therein were competent to contract.

"William C. Foard, one of the complainants, is employed by the State land commissioner in connection with the examination of State lands. Abilene Demerse, also one of the complainants, has resided since 1901 with her husband and family on a farm in the eastern end of the peninsula not far from Sault Ste. Marie. Mr. Foard, being engaged upon the examination of certain lands of the State in the vicinity of the Demerse homestead, arranged with the Demerse people for lodging and board while his work in the neighborhood continued. During the course of the first evening he

spent at the Demerse home, Mrs. Demerse, on learning he was from Marquette county, brought out a clipping from the Mining Journal, which dealt with the case of the Mitchells against the Arctic Iron Company, and mentioned that the lots had been explored and valuable mineral discovered thereon. She stated to Mr. Foard that her father 'was one of the original owners' of the lots described in the newspaper clipping, and she thought 'there was some land there which they were entitled to, but she didn't know what.' Mr. Foard thereupon volunteered to investigate on the occasion of his next trip to Marquette. The records which he examined some two weeks later did not 'look just right' to Mr. Foard, whereupon he invited Mr. Heffernan, later employed as solicitor for the complainants, to look them over. Following these examinations of the public records, Mr. Foard returned to the Demerse homestead and informed Mrs. Demerse 'he thought there was a good chance for her to get a part of her father's land, and that it had never passed entirely,' and that if she employed an attorney 'he would probably get something out of it.' She replied she had no money. He said 'she might get some one to take hold of it on an interest,' and she answered, 'I will give you a half interest if you take hold of it; I can't tell anything about these attorneys.' On his next visit to Marquette, which occurred shortly, Mr. Foard again consulted Mr. Heffernan, and another inspection of the records seems to have confirmed them in the view that the heirs of Jean and Zoe could recover a portion of the lands, whereupon Mr. Foard concluded to accept the offer submitted by Mrs. Demerse, and immediately called upon or wrote the other heirs, at the addresses furnished by Mrs. Demerse, with the result that he eventually obtained from a number, if not from all the heirs, a quitclaim deed of an undivided half of the lots in question and of all other lands at any time owned by Jean or Zoe Blais. The consideration moving from Mr. Foard for these quitclaim deeds was his undertaking to employ an attorney to commence these suits and to furnish means to carry them through this court and the Supreme Court.

"What was the difficulty with the record title of the defendants, which Mr. Foard supposed he found, he did not say. Inferentially it was the notion that the

separate deeds of Jean and Zoe did not convey all the minerals of lots 8 and 9, on the supposition that part thereof was held by them as tenants by the entirety. But, be that as it may, it is quite conclusively shown by the testimony of Mr. Foard that it was a supposed defect in the record title of the defendants to a part of the land, and not fraud or deceit in obtaining either the Mitchell or the Corbett deeds, or the want of mental capacity in either Jean or Zoe to contract, which decided Mr. Foard and the heirs to launch an attack upon the title of the defendants. 'I came up and looked at the records, and from the records I concluded there was a chance to speculate; and I went back to her and told her "I thought there was a good chance for her to get a part of her father's land," ' testified Mr. Foard.

\* \* \*

"As bearing on the good faith of the claims of fraud and mental incapacity put forward by the bills of complaint, the fact is of weighty significance that not a single descendant of Jean or Zoe claimed the deeds were fraudulently obtained, or that either Jean or Zoe lacked the mental capacity necessary to execute the same, until long after they had planned with Mr. Foard to open an attack on an entirely different ground. What happened is not hard to discern. Mr. Foard's first impression of the state of the records was found on a subsequent examination to be incorrect, or the point he had in mind was found to be of doubtful service, whereupon the father and mother were alleged to be insane, and charges of fraud and deceit were spread with a lavish hand upon the pages of the bills of complaint against men long in their graves.

"Whether the prices paid by the Mitchells and by Corbett for the conveyances to them, respectively, were reasonable and fair, in relation to the value of the properties as the same was understood at the time of the transactions, and whether there was fraud or deceit on the part of either of the Mitchells, or on the part of Corbett, in obtaining either of the deeds, the evidence is all one way. The complainants offered no evidence touching the value of the properties at the dates of the disputed conveyances, or showing, or tending to show, that the Mitchells when they purchased, or that Corbett when he purchased, possessed any knowledge or information on the subject of the mineral

value of the properties not also known to Jean and Zoe Blais, and not publicly known in and about the city where the lands are situated.    *    *    *

"In furtherance of their effort to establish that the Mitchells and Corbett took advantage of the alleged ignorance of these people, and deceitfully and fraudulently induced them to part with these properties for a trifling sum compared to their value, the complainants would be expected to at least show that the Mitchells and Corbett sought out Jean and Zoe to bring about the sale.    Whether Corbett applied to Jean, or Jean to Corbett, the testimony does not disclose; but that the property was brought to the Mitchells, that they did not seek the purchase, and only purchased after Jean had called on them repeatedly in an effort to induce them to buy, is an inference well supported by the evidence.    The record does not contain evidence of a single word uttered by either of the Mitchells or by Corbett in the negotiations.    It does not appear that any, much less any false or deceptive, representation regarding the value of the land, or of any matter or thing, by way of inducement to Jean or Zoe to sell at the prices named, or at any other price, or on any other terms, was made by Corbett or by either of the Mitchells to Jean or Zoe, either directly or indirectly, and no attempt whatever was made by the complainants to support by evidence the allegations of fraud and deceit found in the bills of complaint.    *    *    *

"Giving the testimony presented by the complainants its greatest value, and the most that can be said of it is that Blais, in his family relations, was queer, eccentric, unreasonable in his conduct, harsh, of violent temper, and disposed to act in all things in opposition to the comfort, peace, and happiness of his family. But the question here is not whether Jean Blais was an eccentric man, and on occasion did unusual or even foolish things, but whether, at the time he executed the deeds, he had mental capacity sufficient to understand and fully appreciate the business on which he was engaged. *Davis* v. *Phillips*, 85 Mich. 198 (48 N. W. 513) ; *Ramsdell* v. *Ramsdell*, 128 Mich. 110 (87 N. W. 81) ; *Hayman* v. *Wakeham*, 133 Mich. 363 (94 N. W. 1062).    And see, also, *Ward* v. *Ward*, 86 Neb. 744 (126 N. W. 305).

"The record of this case contains a long list of real estate and other important business transactions in which Jean Blais participated during his lifetime, and especially during the period when it is claimed he was incompetent, and it is of weighty import that no member of his family, or any other person, was found to testify that in any one of the numerous, and in some instances very complicated, transactions, Jean Blais made a bad bargain. The extent of the list and the nature of the transactions furnished evidence of his competency to transact intelligently and skillfully, not only ordinary, but difficult, matters, and shows he was shrewd beyond the average man of his education and environment. His children witnessed his conveyances, and some actually bought from him and transacted business with him at a time when they now allege he was of unsound mind. Members of the bar of this circuit, and others who have held and are holding positions of trust and responsibility, and to whom Jean Blais was well known, witnessed his instruments, took his acknowledgments, bought from him, and sold to him.

"According to all accounts Jean Blais was a familiar figure about the city of Negaunee, where he resided for upwards of 30 years, and, if he was of unsound mind, it is surprising the complainants are unable to produce a single person, outside his interested descendants, to testify to his insanity. On the other hand, the defendants produced several persons representing different walks in life who knew Jean well, who transacted business with him and knew of his dealings with others, and who certify to his mental capacity. Among those witnesses was Joseph H. Primeau, at present and for over 16 years last past register of deeds of Marquette county, before that recorder of the city of Negaunee, a countryman and lifelong friend of Jean Blais. Practically all of the instruments, including the deeds to the Mitchells, executed by Jean Blais during Mr. Primeau's long residence at Negaunee, were drafted or witnessed by him, and in many instances Mr. Blais' acknowledgments were taken before Mr. Primeau as notary. That Mr. Primeau had exceptional opportunity and ability to judge whether or not Jean Blais' mentality was such as to enable him to know

the nature, character, and effect of his deeds and to transact his real property and other affairs intelligently and with due regard to his own interests, is undoubted, and respecting Mr. Primeau's credibility there is and can be no question. Mr. Primeau's conclusions are in harmony with the overwhelming weight of the evidence on the question of capacity. He testified:

" 'In all these transactions [in which Mr. Primeau acted as conveyancer for Mr. Blais] he made his own bargains and did all his negotiating, every time. If I did not believe he was a man of good sense, I would not have done business the way I did for him. I considered him very sharp—instead of being an insane person, sharp and shrewd. He had his peculiarities; he was queer; he wanted his will to be fulfilled; he wanted everything his own way; but he was far from being crazy or insane. He acted in the transactions referred to as any good rational man would do. He never raised the idea in my mind that he was an insane person whatever. I found him very rational and very sharp when doing business. I never heard anything contrary to that. He was a man that appeared to have a good many friends, too.'

"The failure to establish that Jean Blais was incompetent when he executed the deeds in question is so complete it is considered unnecessary to discuss the proposition, presented by counsel for the defendants, that in any event, under all the facts and circumstances of this case, his heirs are estopped from asserting his incompetency at this late day. The bill of complaint in both cases will be dismissed, and a decree will be entered quieting the title to the premises as prayed in the respective cross-bills.

"Counsel have found fault with Mr. Foard for undertaking to try out the claims of the heirs on shares. Why he should have refrained from doing what lawyers and others commonly do is not made clear. What, in Mr. Foard's actions, causes special regret, consists of the unfounded aspersions countenanced, if not instigated, by him, upon the character of men whose lips in their own defense were sealed by the hand of death; and in that, without adequate grounds, he aroused in the minds of those poor people only to become the disagreeable office of the court to dispel, visions of wealth

and of release from the hard labor and privations which have been theirs from birth. That they subscribed the allegations of the bills of complaint without full appreciation may be inferred and may not be wondered at. Their disappointment over the result will be hardship enough, without the added burden of costs. The decree in each case will therefore provide for the costs of the defendants to be taxed, but to be recovered from the complainant Foard alone."

BROOKE, C. J., and STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.

This is a case assigned to the late Justice McALVAY, remaining undetermined at the time of his death.