# STATE OF MICHIGAN

# COURT OF APPEALS

---

3100 WOODWARD 2014, LLC,

       Plaintiff-Appellant,

v

WOODWARD AND ERSKINE, LLC, and
SACHSE CONSTRUCTION & DEVELOPMENT
COMPANY, LLC,

       Defendants-Appellees.

UNPUBLISHED
April 5, 2018

No. 335205
Wayne Circuit Court
LC No. 15-010490-CB

---

Before: M. J. KELLY, P.J., and JANSEN and METER, JJ.

PER CURIAM.

Plaintiff appeals as of right the trial court's order denying its motion for summary disposition and granting summary disposition in favor of defendant Woodward and Erskine, LLC,[1] pursuant to MCR 2.116(C)(7) (claim barred by statute of frauds), and (C)(8) (failure to state a claim for relief). We affirm.

## I. FACTS AND PROCEEDINGS

This dispute concerns the validity of easements arising from the development of a city block in the Brush Park Historic District in Detroit ("the block"). The block is bounded by Woodward Avenue on the west, Watson Street on the south, John R Street on the east, and Erskine Street on the north. In 2000 and 2002, the Fraternal Civic Center ("FCC"), an entity related to the Masons, a fraternal organization, acquired title to all property on the block. In 2004, FCC and Belmar Development Group, LLC ("Belmar"), entered into a joint venture agreement ("JV Agreement") for the purpose of developing the block. Belmar subsequently assigned its rights and obligations under the JV Agreement to the entity 3100 Woodward, LLC

---

[1] Defendant Sachse Construction & Development was not named as a party-defendant in plaintiff's first amended complaint and did not thereafter participate in this proceeding. Therefore, the singular term "defendant" is used in this opinion.

-1-

(hereafter "Old 3100 Woodward").[2]  In 2006, pursuant to the JV Agreement plan, FCC conveyed Lots 5, 6, and 1 (also referred to as Parcel 1 and Parcel 2) to Old 3100 Woodward.  Thereafter, Old 3100 Woodward prepared a site plan for developing this area into a condominium project, Crystal Loft.  The Wayne County plat engineer and Old 3100 Woodward's lender, LaSalle Bank, required Old 3100 Woodward to obtain easements to accommodate trash collection and parking. In 2006 and 2007, Old 3100 Woodward recorded declarations of easement, referred to as a trash easement and a parking easement, situated on Lots 7, 8, and 9, which were adjacent to and north of Lot 6.  Although FCC remained the owner of Lots 7, 8, and 9, Old 3100 Woodward executed the easements as grantor, without identifying FCC as the owner or itself as an agent of FCC.  The declarations of easement were recorded with the Wayne County Register of Deeds.

Old 3100 Woodward subsequently transferred its ownership interest in Lots 5, 6, and 1 to Crystal Lofts REO, LLC.  In 2014, FCC conveyed a quitclaim deed to Crystal Lofts REO for whatever interest it might still hold in Lots 5, 6, and 1.  The quitclaim deed referenced the recorded trash easement and parking easement in the description of the property transferred. Subsequently, Crystal Lofts REO conveyed its interest in Lots 5, 6, and 1 to plaintiff.  FCC conveyed its ownership interest in Lots 7, 8, and 9 to defendant.  Before closing the latter transaction, defendant discovered the recorded trash and parking easements, but disavowed their validity.

Plaintiff filed this action seeking declaratory and injunctive relief to confirm its easement rights in Lots 7, 8, and 9.  The parties filed cross-motions for summary disposition regarding the validity of the trash and parking easements.  Defendant argued that the easements were invalid because Old 3100 Woodward had no authority to convey an easement interest on property owned by FCC.  Plaintiff maintained that Old 3100 Woodward had the authority as FCC's agent in the joint venture to grant easements necessary to carry out the JV Agreement's development plans. Alternatively, plaintiff argued that FCC's 2014 quitclaim deed to Old 3100 Woodward ratified the easements or created them anew.  Plaintiff also argued that it was a bona fide purchaser for value of Lots 5, 6, and 1 with the recorded easement rights.  The trial court denied plaintiff's motion and granted summary disposition in favor of defendant pursuant to MCR 2.116(C)(7) and (8).

## II.  SUMMARY-DISPOSITION STANDARDS

Initially, plaintiff argues that the trial court erroneously considered evidence beyond the pleadings in granting summary disposition to defendant under MCR 2.116(C)(8).  We disagree.

We review de novo a trial court's decision to grant summary disposition.  *Haynes v Village of Beaulah*, 308 Mich App 465, 467; 865 NW2d 923 (2014).  "A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint.  All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant."  *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999).  "A motion under MCR 2.116(C)(8) may be granted

---

[2] Plaintiff asserts that Old 3100 Woodward is an entirely distinct entity from plaintiff, 3100 Woodward 2014, LLC.

only where the claims alleged are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Id*. (quotation marks and citation omitted).

Plaintiff correctly observes that a court may consider "only the pleadings" when deciding a motion brought under MCR 2.116(C)(8). *Maiden*, 461 Mich at 119-120. However, if a claim is based on a written instrument that is attached to a pleading as an exhibit, the exhibit "is a part of the pleading for all purposes." MCR 2.113(F)(2). Thus, "[i]n a contract-based action, . . . the contract attached to the pleading is considered part of the pleading." *Liggett Restaurant Group, Inc v City of Pontiac*, 260 Mich App 127, 133; 676 NW2d 633 (2003). A deed is a contract. *Negaunee Iron Co v Iron Cliffs Co*, 134 Mich 264, 279; 96 NW 468 (1903); *Penrose v McCullough*, 308 Mich App 145, 147; 862 NW2d 674 (2014).

Plaintiff's claims were based on the declarations of the trash easement and the parking easement, the JV Agreement, the two amendments to the JV Agreement, the 2014 quitclaim deeds, and Crystal Lofts REO's October 28, 2014, covenant deed to plaintiff. All of these documents were attached to plaintiff's first amended complaint in support of plaintiff's claims to establish the validity of the easements. Accordingly, they were properly considered part of the pleadings for all purposes, and could be considered as part of the analysis under MCR 2.116(C)(8). Plaintiff does not identify any other evidence beyond the pleadings that the trial court considered. The court specifically stated that it would not consider John Gardner's affidavit.

We note that in their respective summary-disposition briefs, both parties cited evidence beyond the pleadings and beyond the contracts that formed the basis of plaintiff's claims. However, plaintiff had moved for summary disposition under MCR 2.116(C)(10) and defendant had also moved for summary disposition under MCR 2.116(C)(7), and MCR 2.116(G)(6) allows a court to consider any affidavits, depositions, and other documentary evidence submitted in support of or in opposition to a motion under each of those subrules. Ultimately, the trial court granted summary disposition under MCR 2.116(C)(8) based on the language of the JV Agreement and the August 2014 deeds. The court determined that the JV Agreement did not grant Belmar or its assignee authority to convey property owned by FCC. The court determined that the August 2014 deeds' descriptions of the property did not create an easement, but merely referenced "easements that were alleged to have already been granted, the 2006 and 2007 trash and parking easements, the court already found to be invalid." Because these documents were part of the pleadings, the trial court did not improperly consider evidence outside the pleadings in deciding the motion under MCR 2.116(C)(8).

Plaintiff also complains that the trial court improperly granted summary disposition under MCR 2.116(C)(7) without stating its reasons. Subrule (C)(7) permits summary disposition if a claim is barred by the statute of frauds. In reviewing a motion under subrule (C)(7), a court accepts as true the plaintiff's well-pleaded allegations of fact, construing them in the plaintiff's favor, unless other evidence contradicts them. *Dextrom v Wexford County*, 287 Mich App 406, 428; 789 NW2d 211 (2010). The Court considers affidavits, pleadings, depositions, admissions, and any other documentary evidence to determine whether a genuine issue of material fact exists. *Id*. at 429.

The statute of frauds, MCL 566.106, provides:

> No estate or interest in lands, other than leases for a term not exceeding 1 year, nor any trust or power over or concerning lands, or in any manner relating thereto, shall hereafter be created, granted, assigned, surrendered or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by some person thereunto by him lawfully authorized by writing.

"An easement is an interest in land that is subject to the statute of frauds." *Forge v Smith*, 458 Mich 198, 205; 580 NW2d 876 (1998). "Contracts conveying an interest in land made by an agent having no written authority are invalid under the statute of frauds unless ratified by the principal." *Id*. at 208-209 (citations omitted). Defendant argued below that the declarations of easement were not valid because they were not signed by an owner of the burdened property. Although the trial court did not explicitly say so, it is clear from its remarks that it agreed with defendant's argument that there was no valid writing conveying the easements. Regardless, we need not be concerned with whether the trial court adequately explained the basis for its decision to grant summary disposition under MCR 2.116(C)(7) because our review is de novo. As further discussed below, on de novo review, we agree that defendant was entitled to summary disposition under MCR 2.116(C)(7) on the basis of the statute of frauds.

## III. OLD 3100 WOODWARD'S AUTHORITY TO GRANT EASEMENT

Plaintiff argues that the trial court erred in concluding that the JV Agreement and amendments did not give Old 3100 Woodward authority to grant the easements over FCC's property. "Issues regarding the proper interpretation of a contract or the legal effect of a contractual clause are reviewed de novo." *McCoig Materials, LLC v Galui Constr, Inc*, 295 Mich App 684, 694; 818 NW2d 410 (2012).

"An easement is the right to use the land of another for a specified purpose." *Penrose*, 308 Mich App at 148 (quotation marks and citation omitted). An easement "may be created by express grant, by reservation or exception, or by covenant or agreement." *Id*. (quotation marks and citation omitted). "A right of way cannot very well be granted by deed, estoppel, or otherwise, by anyone but the landowner." *von Meding v Strahl*, 319 Mich 598, 606; 30 NW2d 363 (1948), overruled in part on other grounds by *Harrison v Heald*, 360 Mich 203; 103 NW2d 348 (1960), as explained in *Schmidt v Eger*, 94 Mich App 728, 733-735; 289 NW2d 851 (1980). "It is the general rule that restrictions will be construed strictly against those claiming to enforce them, and all doubts resolved in favor of the free use of the property." *Moore v Kimball*, 291 Mich 455, 461; 289 NW 213 (1939).

Plaintiff argues that Old 3100 Woodward had authority under the JV Agreement to convey an easement on behalf of FCC, the owner of the burdened property. In support of this argument, plaintiff offers a lengthy discussion of the features of joint ventures and why FCC's relationship with Belmar, succeeded by Old 3100 Woodward, should be classified as a joint venture. However, plaintiff does not argue that the existence of a joint-venture relationship between FCC and Old 3100 Woodward was sufficient by itself to bestow on the latter the

authority to grant an easement over property owned by the former. The pertinent question is whether the JV Agreement and amendments provided such authority.

"When interpreting a contract, the examining court must ascertain the intent of the parties by evaluating the language of the contract in accordance with its plain and ordinary meaning." *McCoig Materials*, 295 Mich App at 694. "Every word, phrase, and clause in a contract must be given effect, and any interpretation that would render any part of the contract surplusage or nugatory must be avoided." *Id*.

Plaintiff relies on *Summers v Hoffman*, 341 Mich 686; 69 NW2d 198 (1955), in support of its argument that the JV Agreement should be interpreted as a joint venture with respect to determining Old 3100 Woodward's authority as FCC's agent. In *Summers, id*. at 689-690, the plaintiff purchased property from the vendor by land contract. The plaintiff alleged that he entered into an oral contract with the defendants whereby the defendants agreed to provide financing to purchase property, clear the title, and develop the land, and the plaintiff agreed to manage the litigation to clear title and manage the development of the property. *Id*. at 690. In addition, the plaintiff "would be entitled to 1/2 of the profits made from the sale thereof after defendants were paid in full for all moneys expended by them in connection with the property." *Id*. After this transaction was completed, the plaintiff and defendants purchased by land contract an adjoining parcel of land from the same vendor. *Id*. at 691. The plaintiff claimed that the "same agreement regarding division of profits, et cetera, also applie[d]" to the second purchase. *Id*. The defendants subsequently denied the existence of any agreement. *Id*. The Michigan Supreme Court concluded that the parties' agreement "amounted to a joint adventure." *Id*. at 692. The Court quoted its decision in *Hathaway v Porter Royalty Pool, Inc*, 296 Mich 90; 295 NW 571 (1941), amended 296 Mich 733 (1941), wherein it stated:

> "It can be said that a joint adventure contemplates an enterprise jointly undertaken; that it is an association of such joint undertakers to carry out a single project for profit; that the profits are to be shared, as well as the losses, though the liability of a joint adventurer for a proportionate part of the losses or expenditures of the joint enterprise may be affected by the terms of the contract. See 17 Ann Cas 1022, 1025; 24 Ann Cas 202, 203, and 39 Ann Cas 1210, 1214. There must be a contribution by the parties to a common undertaking to constitute a joint adventure (see annotation, 63 ALR 909, 910); and a community of interest as well as some control over the subject matter or property right of contract." [*Summers*, 341 Mich at 692, quoting *Hathaway*, 296 Mich at 102-103.]

The *Summers* Court further stated:

> Also, see *Price v Nellist*, 316 Mich 418[; 25 NW2d 512 (1947)]; *Fletcher v Fletcher*, 206 Mich 153[; 172 NW 436 (1919)]. A consideration of the salient facts in the instant case shows that the contract embodied characteristics of a joint venture. A single project was involved, namely, the development and sale of two large parcels of real estate. The profits, after expenses, were to be divided 50% to plaintiff and 50% to defendants. Both made a contribution: plaintiff contributed his time, skill and supervision, while defendants contributed the capital. Both had control over the property as defendants were the record owners of one parcel and

joint owners with plaintiff of the other, while plaintiff was conducting the physical improvement of the land and endeavoring to sell the lots. But defendants claim that under the agreement plaintiff would not share any losses or bear the risk of loss in case of an adverse decision in the suit involving the title to the property. With this contention we cannot agree. "Loss" does not necessarily mean actual "monetary loss." If the land was eventually sold at a loss the result would be that plaintiff's expenditure of time would have been for naught as would defendants' monetary investment. If the title litigation had been decided adversely then plaintiff would have lost large out-of-pocket expenses and the value of the time which he had theretofore spent on the project which, while not quite as concrete or measurable as defendants' cash investment, is nevertheless a loss. It cannot be said that the plaintiff did not share any risk of loss, for as we said in *Hathaway v Porter Royalty Pool, Inc*, *supra* (p 103): "Though the liability of a joint adventurer for a proportionate part of the losses or expenditures of the joint enterprise may be affected by the terms of the contract." [*Summers*, 341 Mich at 693.]

The Court framed the parties' issue as whether the statute of frauds applied "to an agreement between joint adventurers for a division of profits on the sale of land[.]" *Id*. at 694. The Court concluded that statutes of fraud "do not apply to the activity of one joint adventurer in selling the property which is the subject of the venture and in which he has a distinct interest." *Id*. at 696. The Court stated:

> The joint adventure relationship is a fiduciary one in which the members owe each other a high degree of good faith. Each member is both an agent for his coadventurer and a principal for himself. 48 CJS Joint Adventures, § 5, page 827. The property acquired in behalf of the adventure, even though title might be in only one person, is held in trust for all members, each of whom may acquire an equitable interest in the land or the proceeds on performance of his obligations. See *Lane v Wood*, 259 Mich 266[; 242 NW 909 (1932)]; *Rossman v Marsh*, 287 Mich 720[; 286 NW 83 (1939)]; 48 CJS, Joint Adventures, § 7, p 833. [*Summers*, 341 Mich at 696.]

The Court noted that there was no apparent reason "why the legislature would intend to have the statute cover this situation where the legal duties and obligations of the parties are clearly defined, are adequately enforced and protected in the courts, and where the parties are in effect acting on their own behalf in selling property in which they have much more than the usual agent's interest." *Id*. at 696-697.

We are not persuaded that the statement in *Summers*, *id*. at 696, that "[e]ach member [of a joint venture] is both an agent for his coadventurer and a principal for himself" can be isolated from its context and construed as a broad pronouncement that members of a joint venture have full authority to act as each other's agents in all acts related to the purpose of the joint venture. Plaintiff does not cite any more recent or more specific authority endorsing such a pronouncement. Read in context, the statement pertains to the Court's conclusion that the statute of frauds did not apply to the type of business association formed by the plaintiff and the

defendant in that case because the nature of their relationship obviated the need for the protection provided by the statute of frauds.

Plaintiff also places emphasis on the statement in *Summers, id.*, that "[t]he property acquired in behalf of the adventure, even though title might be in only one person, is held in trust for all members, each of whom may acquire an equitable interest in the land . . . ." Plaintiff argues that the JV Agreement pertained to the entire block and that, therefore, Old 3100 Woodward was an agent for FCC and for all the property involved in the venture, notwithstanding that FCC alone held title. Again, we are not persuaded that Old 3100 Woodward's specific authority to convey the easement can be inferred from this general statement. The issue in *Summers* was the application of the statute of frauds to the agreement between the plaintiff and the defendants, not the conveyance of a physical encumbrance on real property. Moreover, the JV Agreement provided that the development would take place in phases, with a schedule in which FCC would deed property to Belmar at specific stages. This schedule indicates that the parties did not intend for Belmar to acquire property rights over the entire block from the outset.

Plaintiff acknowledges that "[w]hether the parties have created a joint venture or some other form depends on their intention, as expressed in the contract." However, plaintiff gives greater emphasis to its general argument that the parties intended to create a joint venture than to the specific question of whether the parties intended for Old 3100 Woodward to have authority to grant the easement. "[W]hen parties have freely established their mutual rights and obligations through the formation of unambiguous contracts, the law requires this Court to enforce the terms and conditions contained in such contracts, if the contract is not contrary to public policy." *Bloomfield Estates Improvement Ass'n, Inc v City of Birmingham*, 479 Mich 206, 213; 737 NW2d 670 (2007) (quotation marks and citation omitted). As the Michigan Supreme Court stated in *St Clair Intermediate Sch Dist v Intermediate Ed Ass's/Mich Ed Ass'n*, 458 Mich 540, 557-558; 581 NW2d 707 (1998):

> Under the common law of agency, in determining "[w]hether an agency has been created," we consider "the relations of the parties as they in fact exist under their agreements or acts" and note that in its broadest sense agency "includes every relation in which one person acts for or represents another by his authority." *Saums v Parfet,* 270 Mich 165, 170-171; 258 NW 235 (1935). We further recognized in *Saums* that "[t]he characteristic of the agent is that he is a business representative. His function is to bring about, modify, affect, accept performance of, or terminate contractual obligations between his principal and third persons." *Id.* at 172; 258 NW 235.

In consideration of the Court's statement that a court must consider "the relations of the parties as they in fact exist under their agreements or acts," we conclude that the scope of Old 3100 Woodward's agency was defined not by general principles pertaining to joint ventures, but by the terms of the JV Agreement.

The trial court found that *Summers* was distinguishable from the instant case because ¶ 7L of the JV Agreement disclaimed a partnership or agency relationship between FCC and

Belmar, the predecessor to Old 3100 Woodward. Plaintiff argues that the trial court misconstrued ¶ 7L, which provides:

> The relationship between the parties shall be limited to the performance of the development contract in accordance with the terms of this agreement. This agreement shall be construed and deemed to be a Joint Venture for the sole purpose of carrying out the development contract. Nothing herein shall be construed to create a general partnership or master/agent relationship between the parties or to authorize either party to bid for or to undertake any other contracts for the other party, except as herein designated. It is agreed, however, that Belmar Development Group, LLC, and/or its affiliate has and shall maintain a majority interest, and may assign such interest for its benefit, as well as the joint benefit of the parties hereto.

Plaintiff argues that the trial court placed undue emphasis on the third sentence of ¶ 7L by reading this sentence to negate fully the existence of a partnership or master-agent relationship. Plaintiff argues that when the third sentence is considered in conjunction with the rest of the paragraph, the clear meaning is that the parties formed a joint venture and principal-master relationship for the limited purpose of developing the property, but the parties did not form a general partnership or agency relationship for any other purpose. We agree that this is the most reasonable interpretation of the third sentence, but that does not resolve the question regarding whether Old 3100 Woodward's agency extended to granting easements on property owned by FCC.

Plaintiff contends that the authority to grant easements is implied by the following three paragraphs:

> [¶ 7A]  Belmar . . . shall join with the Fraternal Civic Center in the development and construction of a mixed use project, situated upon the subject land according to the terms and conditions hereinafter contained.

> *   *   *

> [¶ 7F]  In conjunction with Fraternal Civic Center, Belmar . . . shall prepare a Master Site Plan to be submitted to the City of Detroit – Planning and Development Department, including a new lodge headquarters and upon approval of same by the City, Belmar . . . shall pay to Fraternal Civic Center an additional $250,000.00. Upon payment of the additional $250,000.00, Fraternal Civic Center shall provide access to and convey by deed, contract or assignment the lots as agreed upon in the Master Site Plan and identified as Phase II.

> *   *   *

> [¶ 7J]  The parties to this agreement agree that the final decisions with respect to the scope, plans, and performance of the subject matters contained herein shall be vested with Belmar . . . except for the new lodge building; and as relates to the old lodge facility, no contemplated use shall be planned incompatible with the objectives and principles of the lodges.

We are not persuaded that these provisions, including the provision authorizing Belmar to prepare the master site plan, granted authority to convey easements burdening property that was owned by FCC and that was not part of the property under development by the joint venture. Lots 7, 8, and 9 were parcels adjacent to what would become the Crystal Lofts property and owned by Old 3100 Woodward's partner in developing the future Crystal Lofts property, but these circumstances do not permit a reasonable reading that Old 3100 Woodward was permitted to make conveyances of that property, especially without notice to FCC's successors in interest. Accordingly, neither Old 3100 Woodward's status as a member of the joint venture nor the scope of Old 3100 Woodward's performance of the joint venture empowered Old 3100 Woodward to convey the trash easement or the parking easement.

Plaintiff argues that the Second JV Amendment implicitly recognized Old 3100 Woodward's authority to grant the easements in the statement, "Woodward has delivered to Fraternal a Master Site Plan *which has been approved by Fraternal* and the City of Detroit-Planning and Development . . . ." (Emphasis added.) Plaintiff states that this provision gave Old 3100 Woodward broader rights than Belmar held. We are not persuaded that this statement can reasonably be construed as FCC's endorsement or approval of every action Old 3100 Woodward undertook to accomplish obtaining approval.

Plaintiff cites *Omnicom of Mich v Giannetti Investment Co*, 221 Mich App 341; 561 NW2d 138 (1997), for the principle that a partner's signing of a contract on behalf of a partnership is binding on the partnership even if the contract is executed in the name of only one partner. In *Omnicom, id*. at 343, one of the defendants was a general partnership that owned and operated an apartment complex. Two of the general partners, Jerry Pruzinsky and Anne Marie Pruzinsky, entered into an installation agreement and access agreement with the plaintiff, a cable television provider, enabling the plaintiff to install and maintain a cable-television service for the apartment complex and its tenants. *Id*. A third general partner, Silvio Giannetti, denied the plaintiff access to the property in violation of the agreement. *Id*. The defendants argued that the Pruzinskys did not sign the agreement in the partnership name, and thereby failed to bind the partnership. *Id*. at 344. This Court's decision in *Omnicom* was based on the Uniform Partnership Act, MCL 449.1 *et seq*., specifically MCL 449.9(1), which provides:

> Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

This Court rejected the defendants' argument that this provision should be construed "to mean that a partner cannot bind a partnership when the partner signs in his own name rather than the partnership name." *Omnicom*, 221 Mich App at 344-346. This Court held that the Pruzinskys' signatures were binding because the evidence established that they intended to contract on behalf of the partnership rather than for themselves individually, and because contracting for cable service was clearly related to the course of the partnership's business. *Id*. at 346. *Omnicom* is distinguishable from the instant case, because Old 3100 Woodward did not have authority to

convey easements on FCC's property. Although the access and installation agreements in *Omnicom* involved granting an easement so that the plaintiff could physically install the cable-system hardware, this easement was on the property owned by the general partnership. See *id*. at 343, 347.

In sum, the JV Agreement conferred on Belmar a degree of authority in developing the block pursuant to its agreement with FCC, but that authority did not extend to granting an easement across property still owned by FCC. There is no valid writing, properly executed, conveying the trash easement and parking easement to plaintiff or its predecessors in ownership of Lots 5, 6, and 1. Accordingly, plaintiff cannot enforce the easements against defendant.

## IV. 2014 QUITCLAIM DEED

Plaintiff argues that the trial court erred in concluding that the 2014 quitclaim deed that FCC issued to Crystal Lofts RE did not create the easements anew or ratify Old 3100 Woodward's prior declaration of the easements. The proper interpretation of the language in a deed is reviewed de novo. *In re Rudell Estate*, 286 Mich App 391, 402-403; 780 NW2d 884 (2009).

"In order to create an express easement, there must be language in the writing manifesting a clear intent to create a servitude." *Forge*, 458 Mich at 205. "Any ambiguities are resolved in favor of use of the land free of easements." *Id*. "Where the intent to create an easement is not clear, the issue is to be resolved in favor of use of the land free of an easement." *Id*. at 209.

In *Lakeside Oakland Dev, LC v H & J Beef Co*, 249 Mich App 517, 520; 644 NW2d 765 (2002), the plaintiff seller sold a parcel of property to buyers who planned to construct a restaurant. The buyers wanted an easement from the parcel they were purchasing to a side street, which would allow customers convenient ingress and egress. *Id*.

> Before the closing, the realtors sent the buyers a packet of closing documents, including the survey map highlighting the easement. The seller had executed both a warranty deed with an attached legal description of the property on which the Arby's was to be built and a closing statement. However, there was no reference to an easement, or legal description of an easement, contained in the warranty deed or on the attached legal description of the parcel being sold. The warranty deed indicated that the property to be conveyed was as described in the attached rider. The attached legal description of the parcel being sold referred to the warranty deed. There was no document providing that the seller was granting the buyers an easement over any specific area, and the survey map contained neither language to that effect nor the seller's signature. [*Id*. at 520-521.]

This Court described the circumstances in which the real-estate agreement was closed:

> The seller was not present at the scheduled closing, which was handled by the realtors, a title company, the buyers and the buyers' realtor. The buyers inquired about the easement, and the title company insisted on a legal description of the easement before closing the sale. The realtors promised the buyers that

there would be no problem, and that they would take care of the matter by obtaining the legal description of the easement. The warranty deed, other closing documents, and the buyers' payment were placed in escrow with the title company pending the realtors' submission of the easement description. On May 24, 1996, the parties closed in escrow when the realtors provided the title company with a legal description of the easement. The easement description, prepared for the realtors by their surveyor on the surveyor's letterhead, did not refer to the warranty deed or have the signature of the seller. The easement description contained no language indicating that the sellers were granting the described easement to the buyers. The buyers' payment was released from escrow to the seller. The title company recorded the warranty deed with the two attached legal descriptions (three pages consecutively recorded). [*Id*. at 521.]

The buyers believed that the sale of the land with the easement was complete. *Id*. After they began construction of the restaurant, the seller advised the buyers that they had no easement rights and that they were trespassing on the location of the purported easement. *Id*. at 522. The seller accused the buyers of "surreptitiously attach[ing] the easement description to the warranty deed" in order to obtain an easement that the seller never agreed to sell. *Id*. Although the realtors asserted that the seller "did in fact approve the easement description and the conveyance of the easement," they were unable to produce written authorization from the seller to grant the easement. *Id*. The seller filed suit against the buyer to quiet title and to void any recorded easement. *Id*. The trial court granted summary disposition to the seller and voided the easement on the ground that the buyers failed to produce a written agreement in satisfaction of MCL 566.106. *Lakeside Oakland Dev*, 249 Mich App at 523.

This Court concluded that "the documents that exist in the present case do not manifest a clear intent of the seller to create the easement claimed by the buyers." *Id*. at 525. This Court explained:

The warranty deed does not mention the transfer of an easement. The warranty deed does refer to an attached rider as constituting the description of the property being transferred, and the legal description of the fee simple being transferred refers to the deed; however, the fee description does not mention an easement. The document containing the legal description of the easement does not refer to the warranty deed or the fee simple description, nor does it contain the seller's signature or any language indicating that the seller was transferring an easement to the buyers. The survey map contained no language granting an easement or a signature of the seller. Standing alone, the easement description is just that, an easement description. Moreover, even if the documents manifested an intent to transfer an easement, the seller claims, and it appears to be undisputed, that it never provided realtors with written authority to grant the easement as required by MCL 566.106. Therefore, if the statute of frauds were applied in the present case, the seller would be entitled to judgment as a matter of law as determined by the trial court. [*Id.* at 525-526.]

-11-

This Court concluded, however, that there were material questions of fact regarding the buyers' defense that the seller was equitably estopped from asserting the statute of frauds. *Id*. at 526-529.

"A quitclaim deed conveys any and all right, title, and interest that a grantor has in the lands described in the deed." *VanderWerp v Plainfield Charter Twp*, 278 Mich App 624, 630; 752 NW2d 479 (2008). The quitclaim deed at issue states that FCC "does hereby quit claim to CRYSTAL LOFTS REO, LLC . . . the following described premises situated in the City of Detroit . . . to wit: See Exhibit 'A' attached hereto and made a part hereof; together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining . . . ." Exhibit A states the legal descriptions of Parcel 1 and Parcel 2 (i.e., Lots 1, 5 and 6), and includes the following description of "EASEMENT PARCEL":

> Non-exclusive easement(s) *as created, limited and defined* in declaration of Easement recorded in Liber 45720, page 296 and in Liber 46122, page 1049, Wayne County Records.

This language does not independently convey any easement interest in Lots 7, 8, and 9. It describes the easements as they were created in the 2006 and 2007 declarations, but these declarations were not validly executed and recorded. The quitclaim deed conveys to Crystal Lofts whatever interest FCC might still hold in Lots 5, 6, and 1, including any easement rights related to Lots 5, 6, and 1. There was no language granting an easement, only a statement that Crystal Lofts received the easement held by Lots 5, 6, and 1. The trial court correctly stated that this language "merely describes easements that were alleged to have already been granted, . . . [which] the court already found to be invalid." The trial court's interpretation of the quitclaim deed was consistent with the Supreme Court's holding in *von Meding*, 319 Mich at 609, that the phrase "subject to all easements of record for right of way" in a deed meant "subject to all *valid* easements of record." Similar to the attached rider in *Lakeside Oakland Dev*, Exhibit A merely referred to a previously-recorded easement, without stating that Crystal Lofts REO was granted an easement on the burdened property, or otherwise referencing the burdened property and FCC's ownership.

Additionally, with respect to plaintiff's argument that FCC ratified the conveyances of easement, "[a]cquiescence and ratification are based on a party's knowledge of a prior action and manifest an intent to abide by the action." *In re Beglinger Trust*, 221 Mich App 273, 277; 561 NW2d 130 (1997). The bare recital of the "easement(s) as created" language does not reflect any intent to validate easements that were invalidly created. Nothing in the quitclaim deed reflects FCC's intent to ratify the 2006 and 2007 declarations.

V. BONA FIDE PURCHASER FOR VALUE

MCL 565.29 provides:

> Every conveyance of real estate within the state hereafter made, which shall not be recorded as provided in this chapter, shall be void as against any subsequent purchaser in good faith and for a valuable consideration, of the same real estate or any portion thereof, whose conveyance shall be first duly recorded.

The fact that such first recorded conveyance is in the form or contains the terms of a deed of quit-claim and release shall not affect the question of good faith of such subsequent purchaser, or be of itself notice to him of any unrecorded conveyance of the same real estate or any part thereof.

In *Wells Fargo Bank, NA v SBC IV REO, LLC*, 318 Mich App 72, 110; 896 NW2d 821 (2016), this Court stated:

> Under MCL 565.29, a bona fide or good-faith purchaser for value of an interest in real property may take priority over a prior conveyed interest. *Penrose v McCullough,* 308 Mich App 145, 152; 862 NW2d 674 (2014). "And a good-faith purchaser is one who purchases [property] without notice of any defect in the vendor's title." *Id.* A person having notice of a possible defect in title who fails to make further inquiry into the potential rights of a third party does not constitute a good-faith purchaser. *Id.* at 152–153; 862 NW2d 674. Notice, which can be actual or constructive, "is whatever is sufficient to direct attention of the purchaser of realty to prior rights or equities of a third party and to enable him to ascertain their nature by inquiry." *Id.* (citation and quotation marks omitted). Constructive notice involves imputed notice to a person regarding all matters properly of record. *Id.*

Defendant argues that plaintiff had notice of a defect in the conveyance of easement because the easement was never recorded against the burdened property. Plaintiff argues that the 2014 FCC quitclaim deed is indexed in the Wayne County Register of Deeds, but does not assert that the easements were discoverable to a person searching the chain of ownership to Lots 7, 8, and 9. If plaintiff had attempted to verify the easements as described in the quitclaim deed, it would have discovered that the grantor was not the owner of record of the burdened property. Accordingly, plaintiff is not a bona fide purchaser for value.

Affirmed.

/s/ Michael J. Kelly
/s/ Kathleen Jansen
/s/ Patrick M. Meter

-13-